UNITED STATES of America,
Plaintiff-Appellee,

v.

James Timothy JOHNSON,
Defendant-Appellant.

No. 84–3135.

United States Court of Appeals,
Eleventh Circuit.

Dec. 17, 1986.

William F. Jung, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for defendant-appellant.

Andrew Grosso, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before TJOFLAT and HATCHETT, Circuit Judges, and EATON *, Senior District Judge.

* Honorable Joe Eaton, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

HATCHETT, Circuit Judge:

James T. Johnson, appellant, appeals from the district court's judgment contending that the district court committed error by: (1) failing to suppress a statement, (2) giving an unconstitutional jury instruction, and (3) failing to direct a verdict of acquittal. We find Johnson's first contention meritorious and reverse and remand.[1]

## Facts

On December 5, 1983, a jury convicted James T. Johnson of armed robbery of a federally insured credit union, in violation of Title 18 U.S.C. § 2113(a) and (d) (Count I), interstate transportation of a stolen traveler's check, in violation of Title 18 U.S.C. § 2314 (Count II), and interstate transportation of a stolen credit card in violation of Title 15 U.S.C. § 1644(b) (Count III). Stolen in the robbery were cash, approximately $1,000 in travelers checks, and a wallet containing credit cards of one of the credit union staff members. The robbery victims were unable to identify Johnson as the robber, and fingerprints found in the credit union office did not match Johnson's fingerprints.

Immediately following the time of the robbery, Johnson and a girl friend traveled through the south and southwest using the credit cards and travelers checks taken in the robbery. Eventually they were arrested in Colorado by local law enforcement officers.

At the beginning of an interview, while Johnson was in custody, a Federal Bureau of Investigation (FBI) agent read Johnson his *Miranda* rights. (*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). One of the two agents present informed Johnson that they wanted to discuss with him a credit union robbery in Tampa, Florida, in May, which involved the theft of $1,000 in travelers checks. Johnson stated that he wanted a lawyer and requested that a lawyer be present during questioning, but "in the same

breath" stated, "I know all about the checks and where they came from."

Following this colloquy, the FBI agent asked Johnson if he would like to have the federal criminal process explained. Johnson responded, "yes." The agent described the federal criminal process concerning appearances before a magistrate, the setting of bond, and the possible appointment of a public defender. The FBI agent also stated that the FBI was involved in the matter because the credit union was federally insured. After hearing the FBI agent's explanation, Johnson stated, "All this trouble, all for trying to get some money." The agents then terminated the conversation and left the cell. This statement, upon which we focus, was introduced into evidence at Johnson's trial.

At a hearing on December 5, 1983, the district court denied Johnson's motion to suppress the two statements quoted above. At trial, Johnson testified. During his testimony, he, in effect, admitted guilt on Counts II and III, but testified, as to Count I, that "Cubans" had given him the travelers checks, the credit cards, driver's license, and other items belonging to the credit union staff member, as a refund for bad quality cocaine he had purchased from them a few days earlier.

Upon conviction, the district court sentenced Johnson to twelve years on Count I, two years on Count II, and suspended imposition of sentence and imposed a five-year term of probation on Count III. In February, 1984, Johnson filed a notice of appeal which was dismissed as a result of his failure to file a brief in a timely fashion. Johnson's appeal was later reinstated.

Johnson contends that the district court committed error: (1) by failing to suppress his second statement which was elicited during custodial interrogation after he requested the presence of a lawyer; (2) by giving a jury instruction that shifted the burden of persuasion to him; and (3) by failing to direct a verdict of acquittal on Count I because of insufficient evidence.

1. This opinion was published in the advance sheet as *United States v. Johnson*, 805 F.2d 1518 (11th Cir.1986). Section A, as previously published, is WITHDRAWN, and this opinion is substituted.

### Discussion

■ The fifth amendment to the Constitution requires that when a person is advised of rights during custodial interrogation and the person requests a lawyer, all questioning must cease. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "This is a 'rigid rule that an accused's request for an attorney is per se an invocation of his fifth amendment rights, requiring that all interrogation cease.'" *United States v. Herrera,* 711 F.2d 1546, 1557 (11th Cir.1983) (quoting *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979)).

■ The statement concerning the checks was admissible because it came "in the same breath" as invocation of the right to the presence of a lawyer. At that point, the interrogation should have ceased because Johnson had requested a lawyer. The FBI agent, however, after this statement, asked Johnson a direct question: "Do you want to know what will happen to you?" Moreover, the agent then engaged Johnson in a discussion relating directly and indirectly to the investigation. The FBI agent's question and continuing discussion was more than "a bare inquiry by either defendant or by a police officer which should not be held to initiate any conversation or dialogue." *Oregon v. Bradshaw,* 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).

While stating to an accused in custody that the criminal justice system will be explained sounds innocent enough, those familiar with the criminal arena are well aware of the fact that such an "explanation" is often designed to inform the accused that cooperation may be beneficial when a judicial officer considers such matters as bail. This type of helpfulness is often used to indicate to the accused that the law enforcement officers will "be good if the accused will be good," or infer "Why don't you be good and tell us about it?"

No interest would be served by attempting to list matters that may or may not be discussed by law enforcement officers with an accused in custody after the accused has indicated that a lawyer is desired before further interrogation. It best serves all interests, especially law enforcement, to remain close to the "bright line": interrogation must cease when an accused in custody requests the presence of a lawyer before further interrogation.

While a harmless error analysis may "save the day" in some cases where law enforcement officers are "merely being helpful," we discourage such a practice after an accused, in custody, requests the presence of a lawyer. In cases presenting this issue, we will begin our review with suspicion, mindful of the fact that the inculpatory statement may have resulted from what has become known as the "good guy routine."

■ In this case, the government cannot extricate itself by pointing to the fact that Johnson took the stand, admitted participation in some of the criminal activity, and wove an incredible tale regarding the Cubans. Without the incriminating statement being introduced during the government's case-in-chief, Johnson may not have testified at all. Perhaps, the statement served as the only evidence found by the jury sufficient for conviction. We are mindful that the victims did not identify Johnson, and the fingerprints found in the credit union office did not match Johnson's fingerprints.

The introduction of the inculpatory statement in this case was extremely harmful to Johnson, and cannot be said to be harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The harmless error standard "is an exacting standard that must be uncompromisingly applied...." *Harryman v. Estelle,* 616 F.2d 870, 876 (5th Cir.1980).

Accordingly, the judgment of the district court is reversed, and the case is remanded for a new trial. In light of our disposition, we need not comment on the other issues.

REVERSED AND REMANDED.