UNITED STATES of America,
Plaintiff–Appellee,

v.

Pedro Angel GOMEZ,
Defendant–Appellant.

No. 89–3246.

United States Court of Appeals,
Eleventh Circuit.

April 11, 1991.

---

John M. Fitzgibbons, Kim Munch, Tampa, Fla., for Gomez.

Walter Furr, Karla Spaulding, Asst. U.S. Attys., Tampa, Fla., for the U.S.

Before KRAVITCH and ANDERSON, Circuit Judges and ATKINS *, Senior District Judge.

KRAVITCH, Circuit Judge:

Pedro Gomez appeals his conviction on possession, importation, and conspiracy charges involving a controlled substance.[1] Although the district court ruled correctly on various evidentiary motions challenged by Gomez, it erred by not suppressing Gomez's post-arrest statements which were obtained subsequent to the request for counsel by the accused. We reverse and remand for a new trial.

## I. BACKGROUND

In 1987 and 1988 the government conducted an undercover operation to import narcotics from Colombia into the United States. Government agents Angelo Torres and Victor Thompson, along with informant Joseph Davis, arranged with two Colombian citizens involved in the drug trade, Elias Franco and someone known as "El Espia," to transport several hundred kilograms of cocaine by boat from Colombia to Florida. In February 1988 the agents and Davis travelled to Colombia to pick up the drugs in boats supplied by the government. Prior to leaving they had contacted Julian Restrepo and had arranged that he would be the main contact to receive the drugs when they returned to the United States. Davis and Thompson also met with Franco's wife, Rosa Gomez, who was involved in a Colombian drug organization. She asked many questions about the planned operation and provided them with various telephone numbers. The agents then travelled to Colombia and obtained the cocaine, although Franco delivered only 107 kilograms and not the several hundred they

had requested. They returned to St. Petersburg on March 19.

Torres then met in Tampa on March 28 with Julian Restrepo, Jorge Restrepo, and a woman named Julia. They agreed to have ninety-one kilograms of the cocaine delivered to Julian in Miami, ten kilograms delivered to Jorge in Tampa, and six kilograms were to be held for Franco, who apparently was coming into the United States. On March 29 Rosa Gomez told Torres to call someone named Nury and arrange for someone to pick up the last six kilograms of cocaine. Appellant Pedro Gomez arrived in Tampa later that day to pick up the cocaine. Pedro Gomez had not had contact with any of the agents or informants prior to this point. Torres and Gomez met at a convenience store, where Torres gave Gomez a brown paper bag containing six packages which were wrapped and brick-shaped. Torres testified that he had a substantial conversation with Gomez, during which Gomez had asked him whether the deal had gone well, suggested that the problems which had occurred were due to the drug dealers being nervous about this being their first encounter with Torres (who was acting under the name "Don Ramone"), stated that Rosa Gomez was Franco's wife and that he had been a courier for her for many years, and noted that because his car was not paid for it could be confiscated if he were caught with the "stuff." Torres asserted that he used the word cocaine when referring to the packages and that the cocaine was visible from the top of the bag. Gomez asked if there were seven packages and Torres responded that there were only six kilos. Gomez placed the packages in his car without opening the brown bag. At trial Gomez denied that the words "cocaine" or "kilos" were mentioned during his meeting with Torres.

Gomez was arrested immediately, and the concurrent search uncovered a small packet of cocaine in Gomez's pocket. An inventory search of Gomez's car revealed a

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. The jury acquitted Gomez of the charge of possessing a firearm in relation to a narcotics offense.

loaded pistol in the glove compartment, a mobile telephone, and a book with the phone numbers of several members of the conspiracy, including Rosa Gomez, Nury, some people in Colombia, and a man identified as Sammy. Appellant was taken to the Drug Enforcement Administration (DEA) office, where he was advised of his rights. He stated that he had been sent to Tampa to pick up $7,000 in cash and did not know why he had been arrested. Gomez then stated that he was unwilling to cooperate and requested an attorney. After this request, the questioning officer, Agent Henley, told Gomez that he faced anywhere from ten years to life in prison and that the only way he could receive a lighter sentence was by cooperating. The session then ended.

Minutes later, on his return to the holding cell, Gomez asked Agent Hastings why he had been arrested. Hastings replied that he had been arrested for possession of ten kilograms of cocaine. Gomez, voice cracking, expressed surprise because he had been told seven kilos, and he then asked to speak to someone about cooperating. The agents reconvened to interrogate Gomez again, at which point they once more advised him of his rights. Gomez then stated that he had been sent to Tampa by "Papi" to pick up seven kilograms of cocaine for which he was to be paid $4,600.

Jorge Restrepo had also been arrested and testified at Gomez's trial. He had been Gomez's cellmate, and had not met Gomez before. According to Restrepo, Gomez told Restrepo that he delivered four or five kilograms of cocaine for Sammy Zuluago every week, and sometimes delivered cocaine for Jaime Avalos. Gomez also stated that he planned to assert falsely at trial that he had gone to Tampa to pick up cash.

At his trial Gomez testified that Candeloria Barrios had asked him to go to Tampa to pick up money for her sister, Nury, and instructed him to contact Don Ramone (Agent Torres). The district court refused to admit statements to this effect allegedly made by Barrios after Gomez's arrest.

Also at trial the district court ruled that evidence of Gomez's prior conviction on a firearm charge would be admissible by the government in rebuttal if Gomez testified. Knowing that the government would raise this prior conviction, Gomez testified about the incident on direct examination. In 1983 he was in a car with a stolen license plate. A police officer found a pistol, mace and a ski mask in the car. The car and Gomez were near a bank at the time. Gomez pled guilty to possession of a firearm and received probation. In the closing argument at the trial on the current charges, the prosecutor referred to this prior conviction and to the possibility that Gomez intended to rob the bank, a fact which had not been proven or alleged in the prior case. The jury acquitted Gomez of the firearm charge in this case, but found him guilty of the drug possession, importation, and conspiracy charges.

## II. EVIDENTIARY ISSUES

### A. *Prior Conviction*

■ Appellant contends that the district court abused its discretion by admitting evidence of his prior conviction for possession of a firearm because such evidence is not admissible under Federal Rule of Evidence 404(b).[2] To be admissible under Rule 404(b), extrinsic offense evidence must relate to an issue other than the defendant's character and its probative value must outweigh its prejudicial effect. *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir. 1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979);[3] *United States v. Mitchell,* 666 F.2d 1385, 1389 (11th Cir.), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1340 (1982).

---

**2.** This rule states:

  **(b) Other crimes, wrongs, or acts**

    Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

**3.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Gomez contends both that the evidence of his 1983 conviction was not relevant to issues in the case and that its admission was overly prejudicial. Gomez was charged with possession of a firearm in relation to committing a violation of the narcotics laws in violation of 18 U.S.C. § 924(c). The government introduced the evidence to rebut Gomez's claim that the gun in his glove compartment in this case had *nothing* to do with the drug transportation. It introduced, through the testimony of Hugo Gomez, the police officer who had arrested appellant in 1983, evidence that appellant had been arrested for carrying a concealed weapon, had pled guilty to the charge, and received probation with a provision that the conviction would be removed from his record if he committed no offenses within the ensuing two years. There was no evidence that appellant did not comply with these terms. Appellant argues that because the prior offense was a strict liability crime, Fla.Stat. § 790.01, it could not be used to demonstrate his intent to possess the gun in relation to the drug offense.

Appellant's possession of a concealed firearm on a prior instance is relevant to a charge of possession of a firearm in his car while he sought to transport drugs. He asserted that he routinely carried a weapon for protection because he was in the construction business in Miami. Introduction of a prior conviction for carrying a concealed weapon helped the government establish that Gomez was aware of the dangers of and law relating to concealed weapons and rebut Gomez's claim that the gun was for an innocent purpose and its presence was mere accident or coincidence. The district court did not abuse its discretion in allowing such evidence. *Cf. United States v. Nixon*, 918 F.2d 895, 904 (11th Cir.1990) (admission of evidence of firearms on prior occasion under Fed.R.Evid. 404(b)); *United States v. Pelusio*, 725 F.2d 161, 168 (2d Cir.1983) (same).

Even if the evidence were relevant, Gomez argues, the prejudice of the evidence, and particularly the prejudice of the prosecutor's misuse of the evidence in the closing argument, outweighed the probative value. Although the trial record reveals a basis for appellant's claim,[4] appellant did not object to the prosecutor's closing argument and the jury in fact acquitted Gomez of the firearm charge. In light of the acquittal, we are convinced that the prior crime evidence was not prejudicial. *See United States v. Carter*, 760 F.2d 1568, 1579 n. 4 (11th Cir.1985).

### B. *Evidence Regarding Sammy Zuluago*

Appellant also contends that the district court should not have permitted the

---

**4.** We recognize that the prosecutor, both in his questioning of Officer Gomez and in his closing argument, flirted with prejudicing the jury. Even though appellant Gomez had not been charged with attempted robbery, the prosecutor purposely guided Officer Gomez's testimony to leave the impression that appellant was planning to rob the bank in the 1983 incident:

> Q  Now, is there anything about Fridays that would make a bank or a bank parking lot or a lot next to the bank more appealing to a robber than other ones?
>
> A  Friday is a pay day, a lot of people go there to cash their checks....

Trial Record (v. 15, p. 149). In addition, the prosecutor pressed this inference in his closing statement. After reciting the facts surrounding the prior incident, he stated: "It doesn't take a whole lot of imagination to figure out what he was doing there with that gun. If he wasn't going to rob the bank, then he was going to rob one of the customers." Trial Record (v. 16, p. 48). This court has stressed that it is the prosecutor's responsibility to be scrupulous and avoid all efforts to obtain convictions by going beyond the evidence before the jury. *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. Unit A Feb. 1981). This responsibility includes the duty not to try to use prior act evidence to obtain convictions for actions not before the jury. We cannot countenance statements by a prosecutor which come close to converting relevant prior act evidence into impermissibly prejudicial evidence. Although the jury's acquittal of appellant on the firearm charge here demonstrates that the jury discounted these prejudicial statements, we still find it necessary to reiterate our statement regarding such behavior:

> We warn prosecutors in this circuit that straying from what is charged to get to other matters more prejudicial will be condemned, convictions will be reversed, and where appropriate, disciplinary action will be recommended.

*United States v. Eirin*, 778 F.2d 722, 734 (11th Cir.1985).

government to introduce evidence that Sammy Zuluago entered a drug transaction two months after Gomez's arrest. Although this evidence concerned an event which occurred after the arrest, this circuit has held that evidence inextricably intertwined with the chain of events surrounding the crime charged is admissible. *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir.1985). Gomez was charged with importing and conspiracy to import cocaine. Sammy Zuluago's phone number was listed in a book found in Gomez's car at the time of the arrest, and Jorge Restrepo testified that he discussed Zuluago's drug activity with Gomez. The government presented as a witness the police officer who arrested Zuluago. The officer testified that he found a mobile phone in the car and that the phone number to that phone matched the number listed in Gomez's address book. In this context, such evidence was relevant to the scheme and chain of events surrounding the charged importation conspiracy, and it was not an abuse of discretion to admit such evidence. *See United States v. Killian*, 639 F.2d 206, 211 (5th Cir. Unit A March 1981) (admission of evidence seized after defendant's arrest admissible), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981).

### C. Out-of-Court Statements of Candeloria Barrios

At trial appellant attempted to introduce a statement made by Candeloria Barrios to the effect that she had told Gomez to travel to Tampa to pick up money. This statement would have been relevant to appellant's defense that he did not know he was receiving drugs. The district court, however, found that the statement was barred as hearsay. We agree.

The statement allegedly was made by Barrios in the presence of Gomez and his sister, Mary Angel Garcia, after Gomez had been arrested. Appellant asserted that Barrios was afraid to testify because she thought she would be subject to prosecu-

tion, that she now was unavailable, but that Garcia was prepared to testify as to the content of the conversation. Appellant asserts several reasons for admitting this statement as an exception to the hearsay prohibition: (1) the statement is admissible because it was the statement of a coconspirator under Fed.R.Evid. 801(d)(2)(E); [5] (2) the statement was offered not for its truth but to show Gomez's state of mind on his trip to Tampa, and admissible under Rule 803(3); and (3) Rule 804(b)(3) permitted admission of the statement as a statement against declarant's interest.

■ Appellant acknowledges that most statements of coconspirators made after an arrest cannot amount to statements in furtherance of the conspiracy. *United States v. Postal*, 589 F.2d 862 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). Nonetheless, he argues that because Barrios had not been arrested, her statements could still have been in furtherance of the conspiracy. This contention ignores the fact that Gomez's involvement in the conspiracy had ended, and that Barrios' statement regarding what Gomez had done in the past could not have furthered the conspiracy to import the cocaine which had already been confiscated. Her statement was relevant only to the conspiracy which had ended with Gomez's arrest, and as such could not be admitted under Rule 801(d)(2)(E).

■ Nor could the district court have admitted the statement as indicative of the defendant's state of mind under Rule 803(3). Appellant asserts that the statement would show his state of mind, that is that he thought he was travelling to Tampa to pick up money, and therefore was admissible. Rule 803(3) expressly relates to "[a] statement of the *declarant's* then existing state of mind ... but not including a statement of memory or belief to prove the fact remembered or believed." Gomez attempted to introduce the statement not to show

---

**5.** The government contends that appellant did not present this argument to the district court and cannot raise it on appeal. Our review of the record, however, reveals that appellant's counsel clearly mentioned Rule 801(d)(2) to the court and connected the statement to the furtherance of a conspiracy. R.10–54–55.

Barrios' state of mind, but to show his, and the statement itself concerned her memory of her prior statement. He was not trying to introduce a statement he made concerning his belief at the time of the Tampa trip, but a statement that asserted the truth of his contention that Barrios had told him to pick up money. The district court correctly refused to admit this statement on this ground. *See United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir.1980).

■ Finally, Barrios' statement could not have been admitted under Rule 804(b)(3). That rule permits admission of an otherwise hearsay statement if the declarant is unavailable and the statement is against the declarant's interest. The rule provides, in part, that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." There is no question that Barrios was unavailable, and although the government offers some argument that her statement did not directly assert her culpability, we find that we need not determine that issue because there was no indication of trustworthiness of the statement. The statement occurred after Gomez's arrest, in the presence of the defendant and his sister and no one else. Trustworthiness can be established primarily by demonstrating that the statement was uttered in the presence of a court or law enforcement officer, *United States v. Thomas*, 571 F.2d 285 (5th Cir.1978), but such was not the case here. The court in *Thomas* also observed that, in determining trustworthiness, the court should determine what the possibility was that the declarant fabricated the statement. In other words, it must be unlikely, judging from the circumstances, that the statement was fabricated. Far from indicating trustworthiness, the circumstances surrounding this alleged statement—consultation between conspirators after an arrest of one of them—indicate a possibility of fabrication. The district court correctly denied appellant's attempt to introduce this statement.

## III. DEFENDANT'S POST–ARREST STATEMENTS

Crucial evidence for Gomez's conviction of possession of cocaine with the intent to distribute in violation of 18 U.S.C. § 841 arose out of his statement to the police after his arrest. Initially Gomez was taken to the office of the DEA, informed of his *Miranda* rights, and asked if he wished to cooperate with the investigation. He indicated that he wished to speak with his attorney. Agent Henley testified at trial that after Gomez requested counsel Henley told Gomez that he was in serious trouble but that the agents understood that Gomez was a minor player and that they were really after other people in the conspiracy. He then told Gomez that he need not say anything now, but that he might want to discuss with his attorney the possibility of cooperating. Cooperating would be good for Gomez, Henley stated, because he faced a possible life sentence and a minimum of ten years, and that the only chance he had to reduce the sentence was through cooperation with the government. Gomez then left the room, asked agent Hastings what he was charged with, received the incorrect information that he had possessed ten kilos, and immediately expressed his desire to cooperate. The time between Henley's statements and Gomez's "cooperation" was no more than a few minutes, according to agent Henley. Gomez was again informed of his *Miranda* rights and proceeded to admit that he had gone to Tampa to pick up cocaine and not cash, although he at that time stated that someone named "Papi" had sent him.

Appellant argues that the DEA agents did not properly respect his request for counsel, and that the district court should have granted his motion to suppress. He insists that once he asserted his desire to see an attorney the agents should not have impressed upon him the severity of the possible sentence or the advantages of cooperating, and that agent Hastings' incorrect statement that ten kilos were involved, rather than the actual six, impermissibly elicited Gomez's desire to make a statement. In essence, Gomez contends that the agents' statements after he asserted

his right to counsel amounted to further interrogation in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

*Edwards* established the principle that once an accused has invoked his right to counsel

> a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. ... [A]n accused, ... having expressed his desire to deal with police only through counsel is not subject to further interrogation by authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1885 (footnote omitted). Gomez contends that the agents' discussion of possible sentences constituted further interrogation after he requested counsel. He also presents a related question of whether the agents' statements, combined with agent Hastings' mention of the incorrect amount of cocaine,[6] could constitute an impermissible "badgering [of] a defendant into waiving his previously asserted rights" which *Edwards* sought to prevent. *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990); *Minnick v. Mississippi*, —— U.S. ——, 111 S.Ct. 486, 489, 112 L.Ed.2d 489 (1990).

In *United States v. Johnson*, 812 F.2d 1329 (11th Cir.1986), we considered a similar incident in which, after the accused requested counsel, the officers asked him if he wanted the justice system explained and proceeded to inform him about federal hearings, bond, and appointment of counsel. After this explanation the accused made an incriminating statement. This court reversed the conviction because the question and discussion following the counsel request violated the bright-line rule that interrogation must end upon invocation of the right to counsel. *Id.* at 1331. We have also stated, however, that where the ac-

cused initiates a conversation after a request for counsel, an officer's explanation of the investigation and the possibility of cooperation did not violate *Edwards*. *United States v. Valdez*, 880 F.2d 1230, 1233–34 (11th Cir.1989). In that case the accused requested counsel upon arrest. Hours later, as he was being driven to jail, he asked the officers where he was going. The officers told him and proceeded to explain the justice system and to mention that he might want to cooperate.

The government naturally argues that Gomez's initiation of the conversation with Hastings on the way to his cell constituted a waiver under *Edwards* and *Valdez*. Unlike *Valdez*, however, the agents here continued to talk to Gomez after he requested counsel, stressing the importance of cooperating. In addition, Gomez's "initiation" of a conversation with Henley occurred almost immediately after the interrogation, not several hours later. The government responds that they did not ask Gomez any questions after he requested counsel but only made statements about sentencing. *Johnson*, it contends, relied on the fact that the agents "questioned" the accused. Absent such questioning, the government insists, there was no further interrogation and Gomez's question to Henley constituted waiver by initiation under *Edwards*.

Neither our circuit nor the Supreme Court has created an artificial distinction between "questioning" and "statements." The issue under *Edwards* is whether the police engaged in further *interrogation*, not questioning. Indeed, prior to *Edwards* the Supreme Court established that *Miranda* and its progeny focus on the "interrogation environment" and not simply questioning. *Rhode Island v. Innis*, 446 U.S. 291, 298–99, 100 S.Ct. 1682, 1688–89, 64 L.Ed.2d 297 (1980); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court noted in *Innis* that many techniques of persuasion which are not "questioning" fell under the interrogation rubric, including conversations between police officers in the pres-

---

**6.** Appellant does not dispute that agent Hastings at the time thought that Gomez had held ten

kilograms and that his mentioning this amounted to no more than an innocent mistake.

ence of the accused.[7] Interrogation thus means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 100 S.Ct. at 1689–90 (footnotes omitted). The Court defined "incriminating response" as "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial," *id.* at 1690 n. 5 (emphasis original), and the Court stressed that to limit the definition of interrogation to questioning would "place a premium on the ingenuity of the police to devise methods of indirect interrogation," *id.* at 1689 n. 3 (quoting *Commonwealth v. Hamilton,* 445 Pa. 292, 297, 285 A.2d 172, 175 (1971)).

This review helps crystallize the issue before us: whether the agents should have known that agent Henley's statements to Gomez regarding possible sentencing and the benefits of cooperation were reasonably likely to illicit an incriminating response. In light of the Supreme Court's opinion in *Innis* and our holding in *Johnson,* these statements clearly constituted further interrogation. As we stated in *Johnson,* explanations of possible sentences and of the criminal justice system, though seemingly innocent, are

> often designed to inform the accused that cooperation may be beneficial when a judicial officer considers such matters at bail. This type of helpfulness is often used to indicate to the accused that the law enforcement officers will "be good if the accused will be good," or infer "Why don't you be good and tell us about it?"

No interest would be served by attempting to list matters that may or may not be discussed by law enforcement officers with an accused in custody after the accused has indicated that a lawyer is desired before further interrogation. It best serves all interests, especially law enforcement, to remain close to the "bright line": interrogation must cease when the accused in custody requests the presence of a lawyer before further interrogation.

*Johnson,* 812 F.2d at 1331. The mere fact that agent Henley told Gomez that he need not respond does not alleviate his duty to cease interrogation; that would place the officer's artifice in interrogation over our concern with the interrogatory environment. Once Gomez requested an attorney, agent Henley should have respected that request. Any information he had regarding cooperation and sentencing could be addressed to the attorney. Indeed, the attorney would likely request it himself. An officer should know that he can tell the attorney any information regarding sentencing, and that emphasizing to the accused the possible harsh sentences and the benefits of cooperation will likely be interpreted by the accused as pressure to respond and "come clean." This is precisely the type of psychological ploy *Innis* and *Miranda* sought to prevent. *Innis,* 100 S.Ct. at 1689; *Miranda,* 86 S.Ct. at 1615.

Nor does *Valdez* salvage this situation. In that case the defendant initiated further conversation *prior to* the officer's discussion of cooperation. 880 F.2d at 1234. In addition, the court in *Valdez* admitted that the issue was close, and observed that even were the interrogation impermissible, the error was harmless in light of other evidence at trial. *Id.* Finally, to the extent that the government reads *Valdez* to require questioning by the officer in order for there to be interrogation, *Innis* clearly rejects such formalism.

The fact that Gomez began the conversation with agent Hastings does not cure the infection of the further interrogation. Although *Edwards* permits further interrogation if the accused initiates the conversation, *Edwards,* 101 S.Ct. at 1885, the validity of this waiver logically depends on the

---

7. Specifically, the Court held that interrogation occurred when police officers, while driving the accused away from the scene of the crime and after he had requested counsel, discussed the possible danger to children if the police could not find the murder weapon which was lost near a school; therefore the accused's inculpatory words and actions, which occurred after the officers' discussion, were found to have been coerced in violation of *Miranda. Innis,* 100 S.Ct. at 1690–91.

accused being free from further interrogation. In other words, the "initiation" must come prior to the further interrogation; initiation only becomes an issue if the agents follow *Edwards* and cease interrogation upon a request for counsel. Once the agents have, as here, violated *Edwards*, no claim that the accused "initiated" more conversation will be heard.[8] Indeed, *Edwards* would be rendered meaningless if agents were permitted to continue interrogation after the request for counsel, and then claim that the consequent response by the accused represented initiation and permitted a waiver of the asserted counsel right.[9]

■■■ The law in this area is clear: once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation. *Innis*, 100 S.Ct. at 1689; *Johnson*, 812 F.2d at 1331. Any information or discussion regarding the case should be addressed to the accused's attorney. *Only* if the *accused*, after requesting counsel, voluntarily initiates further communication can the agents pursue more information and interrogation. *Edwards*, 101 S.Ct. at 1885. Agent Henley's statements constituted further interrogation and occurred immediately prior to Gomez's request to cooperate, rendering suspect the voluntariness of Gomez's "initiation" of the conversation and his desire to cooperate. The subsequent inculpatory statements by Gomez were therefore inadmissible at trial.

■■■ As we stated at the outset, the inculpatory remarks made by Gomez were crucial to the prosecution's case. His defense at trial was that he did not know that he was to pick up cocaine; his statement to the DEA asserted the opposite. Such an error cannot be considered harmless unless, "absent the so-determined unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish guilt of the accused beyond a reasonable doubt." *Owen v. Alabama*, 849 F.2d 536, 540 (11th Cir.1988). Although the government had other evidence to support its case, including the testimony of Jorge Restrepo and the evidence from the arrest, it is quite possible that the jury's evaluation of this other evidence could have been heavily affected by its awareness of the inadmissible statements. The other evidence was not so overwhelming that it rendered harmless the admission of the coerced statements. At a new trial the government will have an opportunity to present its evidence without the pall of an unconstitutionally obtained statement.

## IV. CONCLUSION

Because Gomez's statement to the DEA agents after his arrest was obtained subsequent to a violation of his fifth amendment rights, the district court clearly erred in denying Gomez's motion to suppress the statement. We reverse and remand for a new trial consistent with this opinion.

**REVERSED AND REMANDED**

---

8. It may be possible for enough time to elapse between the impermissible further interrogation and the "initiation" that the coercive effect of the interrogation will have subsided. Here, however, the government does not contend, nor could it, that the few minutes during which Gomez was being escorted to the holding cell could constitute time sufficient to overcome the coercion of the interrogation.

9. We are mindful of the fact that the district court found that Gomez initiated the conversation, which permitted further interrogation. Al-

though the finding of initiation is considered a factual issue, *Fike v. James*, 833 F.2d 1503 (11th Cir.1987), the district court incorrectly assumed that initiation was possible here because it incorrectly determined that the officer's continued statements to Gomez after he invoked his right to counsel did not constitute further interrogation and did not violate *Edwards*. As we stated above, because the officers did violate *Edwards* by continuing the interrogation, an *Edwards* type of initiation was not possible. The district court therefore clearly erred in its finding of initiation.