[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-11471
Non-Argument Calendar
_____

D.C. Docket No. 8:10-cr-00438-VMC-TBM-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAISY LOUISE THOMAS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 10, 2013)

Before HULL, JORDAN and BLACK, Circuit Judges.

PER CURIAM:

Daisy Thomas appeals her convictions for conspiracy to obstruct commerce by robbery, in violation of 18 U.S.C. §§ 371 and 1951(a), obstructing commerce by robbery, in violation of 18 U.S.C. § 1951(a), and using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).  On appeal, Thomas argues the district court erred in denying her motion to suppress false exculpatory statements she made after invoking her right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). Thomas further argues the district court's error was not harmless.  We affirm.

## I.  BACKGROUND

### A.  *Thomas's arrest and interrogation*

Daisy Thomas was arrested in July 2010 for fraudulent use of a stolen credit card, but police suspected Thomas was involved in, or knew something about, the robberies in which the credit cards were stolen.  Thomas was handcuffed, taken into a small room, and interrogated by two law enforcement officers, Detective Neal and Detective Richardson.  The Government claims Detectives Neal and Richardson brought Thomas into the interrogation room, advised her of the charges against her, and read Thomas her *Miranda* rights, at which point Thomas refused to sign the waiver and invoked her right to counsel.  The Government claims the detectives then ended the interrogation.

2

Video of the interrogation, however, tells a different story.  The video shows Thomas invoked her right to counsel almost immediately upon entering the interrogation room, long before the police claim she did.  To be precise, at 1 minute and 25 seconds of the video Thomas tells Detectives Neal and Richardson she is "not talking without a lawyer—no way."  Rather than ending the interrogation, however, the video shows the detectives continued interrogating Thomas, discussing the case, discussing the benefits of talking, and warning her of the consequences of not talking.  In response to Thomas's request for counsel Detective Richardson pointedly asked "[s]o then you just want to get charged with everything . . . without letting us hear your side of it?"  Detective Richardson told Thomas her failure to talk without counsel would lead her to being "hemmed up with another felony"—by which Richardson meant Thomas "could potentially be charged with other offenses from other counties."  The detectives told Thomas "there are some additional things, some very serious charges" that could be placed on her, and that her "name has come up in some other investigations."  Detective Neal told Thomas they could help her out by making "a simple phone call" to the "state attorney" if she cooperated—which necessarily included talking to them without the benefit of the counsel she had requested.  The video reveals it was not until Thomas invoked her right to counsel *again* that the police stopped

3

questioning her, but not before "not[ing] in passing that they soon would be arresting" Thomas's boyfriend.  The video ends shortly thereafter.

According to the Government, the detectives then moved Thomas from the interrogation room to a holding cell.  During her 10 to 15 minutes in the holding cell, Thomas "yelled here and there" and muttered "a few choice swear words," although she generally said "nothing pertinent."  At one point, however, Thomas yelled "I sure hope you have your facts straight because I wasn't there.  Uh, I hope you've done your work, I didn't do anything."  Detective Richardson responded "we've done all our work" and "we've made a number of arrests" before naming Rykieth Levatte and Antione Harris as among those arrested.  Thomas interrupted Richardson by denying any knowledge of Levatte and Harris, yelling that she did not fraternize with juvenile delinquents.

B. *The district court's hearing and verbal order denying Thomas's motion to*
   *suppress*

Thomas was indicted, along with five alleged co-conspirators, for conspiring to commit armed robberies, committing or aiding and abetting the commission of an armed robbery, and brandishing or aiding and abetting the brandishing of a firearm while committing an armed robbery.  The indictment alleged Thomas participated in an armed robbery of the "All About You Hair Salon" on May 11,

4

2010, and conspired to commit several others between May 11, and June 3, 2010.

Prior to trial, Thomas moved to suppress the statements she made from the holding cell. The Government intended to use those statements to establish Thomas knew her alleged co-conspirators, Levatte and Harris, on the theory that she must have known them in order to know they were juveniles. Thomas's motion to suppress argued the holding-cell statements were barred under *Miranda v. Arizona*, 384 U.S. 436 (1966). Specifically, the detectives violated the rule in *Edwards v. Arizona*, 451 U.S. 477 (1981) by interrogating Thomas after she first requested counsel, and therefore her statements from the holding cell "were irreparably tainted by custodial interrogation." The Government's response motion argued Thomas's false exculpatory remarks from the holding cell were "post-*Miranda* spontaneous statements" that "waived, or relinquished, [Thomas's] Fifth Amendment right to remain silent."

At the hearing on Thomas's motion to suppress, the Government entered the interrogation video into evidence but did not play it for the judge. On direct examination, Detective Richardson testified that once Thomas requested counsel, the interrogation ended and "[n]o questions were asked of [her]." Only later in the holding cell did Thomas spontaneously make the statements at issue, according to Richardson.

5

Prior to cross-examination, the court permitted defense counsel to play the entire video. At that point, Richardson conceded that Thomas "immediately said she didn't want to talk to [the police]." Richardson defended her continued interrogation of Thomas, however, by claiming she merely wanted Thomas "to have the educated information of what . . . the potential charges down the road were coming, and give her the opportunity to speak." Richardson further testified, despite video evidence to the contrary, that her partner Detective Neal never "said anything about calling the prosecutor."

The district court orally delivered its findings of fact and conclusions of law. The court denied Thomas's motion to suppress, reasoning that Thomas "knowingly waived her rights" when she "spontaneously initiated" discussion of the case in the holding cell. The court noted that although "the defendant had initially said that she did not wish to speak to law enforcement," her statements from the holding cell were "spontaneous[]" and therefore "waived whatever rights she might have had to remain silent."

At trial, the Government offered Thomas's statements both in Detective Richardson's testimony as well as in closing argument. The jury subsequently convicted Thomas of the offenses charged in the indictment. This appeal followed.

## II. DISCUSSION

6

A district court's ruling on a motion to suppress presents mixed questions of law and fact. *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).  This Court reviews the district court's factual findings for clear error and its application of the law to the facts de novo.  *Id.*  We construe the facts in the light most favorable to the prevailing party below, but in doing so we are "not restricted to the evidence presented at the suppression hearing and instead consider the whole record."  *Id.*

## A.  *The admissibility of Thomas's statements from the holding cell*

The district court erred in denying Thomas's motion to suppress.  Thomas unequivocally invoked her right to counsel 1 minute and 25 seconds into her interrogation when she told Detectives Neal and Richardson she was "not talking without a lawyer—no way."  *See, e.g.*, *Maryland v. Shatzer*, 559 U.S. 98, 130 S. Ct. 1213, 1224 (2010) (noting a defendant unequivocally requested counsel when he stated "he would not talk about th[e] case without having an attorney present").  This Court has stressed that "once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation."  *United States v. Gomez*, 927 F.2d 1530, 1539 (11th Cir. 1991); *see also United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir. 1986) ("It best serves all interests, especially law enforcement, to remain close to

7

the 'bright line':  interrogation must cease when an accused in custody requests the presence of a lawyer before further interrogation.").

In this case, the interrogation video reveals Detectives Neal and Richardson did precisely what the law forbids.[1]  After Thomas requested counsel, the detectives not only continued discussing Thomas's case, but they also pressed on her the possible "benefits of cooperation" as well the penalties of disobedience. *See Gomez*, 927 F.2d at 1539.  In doing so, Detectives Neal and Richardson unmistakably violated *Edwards*'s "rigid prophylactic rule."  *See Towne v. Dugger*, 899 F.2d 1104, 1106 (11th Cir. 1990), *abrogated on other grounds by Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350 (1994); *see also Smith v. Illinois*, 469 U.S. 91, 92–96, 105 S. Ct. 490, 491–93 (1984) (per curiam) (holding police violated *Edwards* when they continued questioning a defendant after his initial invocation of the right to counsel, even though he responded to the subsequent questioning).

The Government claims Thomas's statements from the holding cell were

---

[1] The interrogation video is part of the record and was entered into evidence before the district court.  Neither the Government nor Thomas challenges its accuracy or authenticity.  Even construing the facts in the light most favorable to the prevailing party, we do not simply ignore accurate video evidence that "completely and clearly contradicts [that] party's testimony." *Cf. Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible.") (citing *Scott v. Harris*, 550 U.S. 372, 380–81, 127 S. Ct. 1769, 1776 (2007) (holding that, for purposes of summary judgment in the qualified immunity context, a plaintiff's factual narrative need not be accepted if contradicted by credible, unchallenged video evidence)).

admissible under *Miranda* and *Edwards*, because they were voluntary and spontaneous. The Government is wrong as a matter of law. *See United States v. Farley*, 607 F.3d 1294, 1326 (11th Cir.2010) (noting voluntariness is a question of law). An *Edwards* violation carries a "presumption of involuntariness," *Shatzer*, 130 S. Ct. at 1220, that is not instantaneously ameliorated when police end an interrogation. Under this Court's precedent, a defendant's statement made several hours after she requests counsel may be uncoerced and voluntary, *see United States v. Valdez*, 880 F.2d 1230, 1233–34 (11th Cir. 1989), but a statement made "no more than a few minutes" after an *Edwards* violation does not meet the legal standard for voluntariness, *see Gomez*, 927 F.3d at 1536, 1538–39; *cf. Henderson v. Singletary*, 968 F.2d 1070, 1074 (11th Cir. 1992) (holding that, in the absence of an *Edwards* violation, the amount of time between interrogation and a defendant's statement is only one "measure of . . . voluntariness").

This case is remarkably similar to our decision in *United States v. Gomez*. There, like here, the prosecution sought to introduce statements made shortly after an *Edwards* violation. *Gomez*, 927 F.2d at 1533, 1538–39. In *Gomez*, while being moved to a holding cell a "few minutes" after an unlawful interrogation, the defendant spontaneously asked an officer why he had been arrested. *Id.* Upon hearing the charges against him, Gomez "asked to speak to someone about

9

cooperating," at which point police advised him of his rights again, he signed a waiver, and then confessed. *Id.* This Court held the defendant's statements were inadmissible, because once the government "violate[s] *Edwards*" "a few minutes" is not enough time for the "coercive effect of the [impermissible] interrogation" to "have subsided." *Id.* at 1539 & n.8.

In this case, like *Gomez*, "no more than few minutes" had elapsed between the impermissible interrogation and Thomas's statement in the holding cell. *See id.* at 1537. Also, like *Gomez*, Detectives Neal and Richardson persisted in interrogating Thomas in violation of *Edwards* and "stress[ed] the importance of cooperating" even after she initially invoked her right to counsel. *See id.* at 1537–39. Moreover, this Court in *Gomez* excluded the defendant's confession even though he—unlike Thomas—received fresh *Miranda* warnings and signed an explicit waiver form prior to inculpating himself. *See id.* Thomas's motion to suppress should have been granted under *Gomez*.

In denying Thomas's motion to suppress, the district court relied on our decisions in *Henderson v. Dugger*, 925 F.2d 1309 (11th Cir. 1991), and *United States v. Valdez*, 880 F.2d 1230 (11th Cir. 1989). But those decisions are readily distinguishable, since neither involved a preliminary *Edwards* violation. In *Valdez*, police "ceased interrogation" of the suspect as soon as he requested counsel and it

10

was not until several hours later, when being transported to jail, that the defendant began asking questions and subsequently confessed. 880 F.2d at 1234. This Court held Valdez's statements were admissible under *Edwards* because police had respected his initial request for counsel and the intervening hours eliminated any residual coercion he might have experienced. *See id. Henderson* is similarly distinguishable as it involved a confession proffered five hours after a suspect initially requested counsel—a request the police honored pursuant to *Edwards*. *Henderson*, 925 F.2d at 1311–13. *Henderson* simply stands for the proposition that a suspect is free to "change[] his mind with regard to giving a confession to the police," but that such a confession is admissible only when it is clear the defendant gave it "of his own volition." *Singletary*, 968 F.2d at 1075. Here, the initial *Edwards* violation distinguishes *Henderson* and *Valdez* and brings this case squarely in line with *Gomez*.

The law on this issue is clear: *Gomez* bars post-interrogation statements like Thomas's made only a "few minutes" after an *Edwards* violation. And this rule makes good sense. If, as the Supreme Court has held, even a "single consultation with an attorney does not remove . . . the coercive pressures that accompany custody," *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S. Ct. 486, 491 (1990), we fail to see how 10 or 15 minutes of unbroken custody in a holding cell *without*

11

an attorney could remove such pressures.[2]  The district court erred in denying

Thomas's motion to suppress.

B.  *Thomas's statements from the holding cell and harmless error analysis*

Our determination the district court erred does not end the matter, however,

since *Miranda* violations are subject to harmless error analysis.  *United States v.*

*Ramsey*, 992 F.2d 301, 306 (11th Cir. 1993).  A *Miranda* error is harmless when it

is beyond a reasonable doubt the erroneously admitted statements "did not

contribute to the verdict obtained."  *United States v. Pena*, 897 F.2d 1075, 1082

(11th Cir. 1990).  In making that determination, we consider the effect of the

statement (1) "upon the other evidence introduced at trial," and (2) "upon the

conduct of the defense."  *United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir.

2006) (internal quotation marks omitted).

Thomas's statement from the holding cell satisfies the harmless error

standard for *Miranda*.  In the holding cell, Detective Richardson named Rykeith

Levatte and Antoine Harris as the two individuals police had arrested other than

---

[2] *Cf. McKinney v. Ludwick*, 649 F.3d 484, 490–91 (6th Cir. 2011) (holding one night was enough time for the "coercive effect" of an *Edwards* violation to "subside[]" (citing *Gomez*, 927 F.2d at 1538–39)); *Hill v. Brigano*, 199 F.3d 833, 840–43 (6th Cir. 1999) (holding one day was enough time for the coercive effect of an *Edwards* violation to dissipate, particularly when, in the interim, the accused appeared before a magistrate judge, received fresh *Miranda* warnings, and received appointed counsel (citing *Gomez*, 927 F.2d at 1538–39)); *McFadden v. Garraghty*, 820 F.2d 654, 660–61 (4th Cir. 1987) (holding an "initial *Edwards* violation" was "vitiate[d]" by a one-night break in interrogation, a "change in place of the interrogations, [a] change of identity of the interrogators and [a] change of the subject matter of the interrogations").

Thomas.  Thomas denied knowing Levatte and Harris, but in doing so she identified them, correctly, as juveniles.  On appeal, Thomas argues the admission of her statement was prejudicial.  But this contention is meritless.  Even assuming Thomas's statement was "incriminating" in an abstract sense, *see Harryman v. Estelle*, 616 F.2d 870, 876–77 (5th Cir. 1980),[3] there is no "reasonable possibility" the statement contributed to her conviction in light of the overwhelming evidence of her guilt, *see Hart v. Att'y Gen. of State of Fla.*, 323 F.3d 884, 895 (11th Cir. 2003).

   *1.  Other evidence adduced at trial*

   Thomas's statement had no prejudicial effect on the other evidence of her guilt.  At the outset, it is important to clarify exactly who Thomas denied knowing.  The Government's evidence showed Levatte and Harris are Thomas's cousins— relatives by blood relation.  Even if Thomas hadn't falsely denied knowing Levatte and Harris, her literal and figurative familiarity with them was plainly evident based on their family connection.  Thomas's statement merely shows she was not telling the truth in the holding cell, but it did not contribute to establishing a conspiracy among the parties.  That conspiracy was independently proven by the

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.  *Harryman* held that, although a particular statement was "incriminating," its admission was nonetheless harmless error in light of other evidence.  *See* 616 F.2d at 877.

testimony of Levatte and Harris, in addition to other evidence.[4]  Levatte and Harris testified Thomas not only participated in the robberies—brandishing a firearm in one and acting as the getaway driver in another—but also that she initiated the plan, selected the target, attempted to use a debit card stolen during the May 11 robbery, and continued to participate in the conspiracy from prison by offering to pay Levatte several thousand dollars to falsely inculpate another woman in the robberies.  Given this testimony as well as other evidence, there is no reasonable possibility Thomas's statement from the holding cell contributed to the jury's finding she was involved in the charged conspiracy.

Additionally, Thomas's false exculpatory statement was not "closely tied to" the non-conspiracy offenses with which she was convicted, and therefore "could have made little difference to the jury verdict." *See Arbolaez*, 450 F.3d at 1293. Aside from the conspiracy charge, Thomas was convicted on Counts Two and Three for committing an armed robbery and brandishing a firearm during the armed robbery of a hair salon on May 11, 2010.  To prove those offenses,[5] the

---

[4] Other evidence proving Thomas's involvement in the charged conspiracy included incriminating cell-phone records, cell-phone tower data, and the victim's credit card statements.

[5] According to the jury instructions, Count Two required the Government to prove: (1) the "defendant knowingly acquired someone else's personal property," (2) the "defendant took the property against the victim's will by using actual or threatened force or violence or causing the victim to fear harm either immediately or in the future," and (3) the "defendant's actions obstructed, delayed or affected commerce."  Under Count Three, the Government needed

14

Government presented, inter alia, the following evidence:  (1) Levatte and Harris testified Thomas participated in, supervised, and boasted about her involvement in the May 11 robbery; (2) video surveillance of the robbery showed a woman who physically resembled Thomas brandishing a firearm during the robbery; (3) Levatte identified the woman brandishing a firearm in the video as Thomas; and (4) the victim of the May 11 robbery gave eyewitness testimony that the woman Levatte identified as Thomas appeared to be leading and orchestrating the robbery.

This is not a case in which the evidence of Thomas's guilt was merely "circumstantial without [her] statements."  *Cf. United States v. Ramsey*, 992 F.2d 301, 306 (11th Cir. 1993), *abrogated on other grounds by*, *United States v. Davis*, 512 U.S. 452, 114 S. Ct. 2350 (1994); *cf. also United States v. Lall*, 607 F.3d 1277, 1293 (11th 2010) (holding a *Miranda* violation was not harmless error when the "only other inculpatory evidence was the testimony of" a single "cooperating witness who claimed to have conspired with" the defendant); *Hart*, 323 F.3d at 895 (finding *Miranda* error prejudicial when the only evidence linking the defendant to the crime, other than his statements, was a single fingerprint that could have been left at any time, and neither the eyewitness nor the four codefendants testified).  In light of the overwhelming direct and circumstantial evidence of her guilt,

to prove:  (1) the "defendant committed the crime of violence charged in Count Two of the Indictment," (2) the "defendant knowingly carried a firearm," and (3) the "defendant carried the firearm in relation to the crime of violence."

15

Thomas's improperly admitted statement did not have a prejudicial effect on the other evidence presented at trial.

### 2. *Effect on defense counsel*

Thomas's statements from the holding cell also did not affect defense counsel in any discernible way. Defense counsel's strategy clearly was to undermine the credibility of Levatte and Harris, the Government's key cooperating witnesses. Counsel attempted to persuade the jury not to believe Levatte and Harris, arguing they were liars and felons whose testimony was inaccurate, self-serving, and nonsensical in light of other evidence. Defense counsel even went so far as to implore jurors that, "if you don't believe [Levatte and Harris's] testimony, then you can't find the defendant guilty."

On the facts of this case, there is no logical or evidentiary connection between Thomas's false exculpatory statement and the believability of Levatte and Harris. Thomas's statement suggested only that she was not being truthful in the holding cell, but that fact, even if proven, has no bearing on Levatte and Harris's credibility. Thomas has pointed to no aspect of defense counsel's trial strategy or evidentiary presentation that would have been different absent the admission of her statement from the holding cell. *Cf. Hart*, 323 F.3d at 895 (holding *Miranda* error prejudicial, in part, because the defense presented testimony it otherwise would not have due to the improperly admitted statements). As a result, Thomas cannot show

16

defense counsel was affected by the improper admission of her false statements.

* * *

All relevant considerations counsel in favor of upholding Thomas's convictions. The admission of Thomas's false statement was undoubtedly error, but it was also undoubtedly harmless. We have no difficulty concluding it is beyond a reasonable doubt the improperly admitted statement did not contribute to the jury's verdict finding Thomas guilty as charged. *See Arbolaez*, 450 F.3d at 1293.

## III.  CONCLUSION

The district court erred in denying Thomas's motion to suppress. However, in light of all evidence in the record, the court's error was harmless. The district court's ruling and Thomas's convictions are **AFFIRMED.**

17