UNITED STATES of America,
Plaintiff–Appellee,

v.

Mark A. THOMAS and Sabrina A.
Richards, a/k/a Sabrina A. Riggs,
Defendants–Appellants.

Nos. 92–3931, 93–1027.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 20, 1993.

Decided Dec. 15, 1993.

Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, James T. Zuba, Asst. U.S. Atty., Scott A. Verseman (argued), Rockford, IL for U.S.

Terry L. Deck, Rockford, IL (argued), for Mark A. Thomas.

David J. Brown, Rockford, IL (argued), for Sabrina A. Richards.

Before POSNER, Chief Judge, MANION, Circuit Judge, and FOREMAN, Senior District Judge.[*]

FOREMAN, Senior District Judge.

These consolidated appeals arise from charges filed against the defendants in the armed robbery of the School Employees Credit Union in Sterling, Illinois. Mark Anthony Thomas pled guilty to two counts of an indictment charging him with aggravated robbery and use of a firearm during a crime of violence in violation of 18 U.S.C. §§ 2113(a) & (d), 924(c). Sabrina A. Richards, who goes by her maiden name of Sabrina Riggs, was convicted after a three-day trial on charges of aiding and abetting Thomas in both of these crimes.

Thomas was sentenced to a 100–month term of incarceration. On appeal, he challenges the district court's decision to enhance his sentence under the federal Sentencing Guidelines for obstruction of justice. Riggs, who received a 135–month sentence, contends that the district court erred in refusing to suppress statements she gave to the case agents regarding her involvement in the robbery and in refusing to allow her to present certain testimony and exhibits relating to her coercion defense. For the reasons stated below, we affirm.

## Facts

Thomas and Riggs robbed the School Employees Credit Union at approximately 7:30 a.m. on January 15, 1992, as an employee was in the process of opening the facility. Riggs remained outside in the car while Thomas, wearing a mask, forced his way into the building with the employee and demanded that she turn over the money in the credit union's master drawer. When Thomas fled the facility with the money, he got back into the car and the pair drove back to Thomas's apartment at the Jul's Motel. Both Thomas and Riggs have admitted their involvement in the robbery. Riggs, however, asserted that she was coerced into helping Thomas.

During the months leading up to the robbery, Thomas and Riggs were involved in a stormy, and sometimes violent, relationship. Riggs, who had shared an apartment with Thomas for several months during 1991, testified that Thomas had beaten her on numerous occasions. She testified that after she learned that she was pregnant with Thomas's child in September 1991, Thomas would go so far as to inflict his blows upon her abdomen. Riggs eventually moved back home with her parents in Sterling in October 1991, but would still frequently spend the night with Thomas at the apartment.

Riggs testified that Thomas had threatened to harm her and her unborn child if she refused to assist him in the robbery. However, the government presented evidence that Riggs, who had worked at the credit union for several months during the fall of 1991, had helped plan the robbery from the beginning and was a willing participant.

Riggs was quickly identified as a suspect in the robbery based upon information from a construction worker who had observed Riggs sitting in the car outside the credit union. As a result, law enforcement officers arrived at the apartment at the Jul's Motel within a few hours after the robbery. Federal Bureau of Investigation Special Agent Gary Fuhr and police officer Connie Frank took Riggs outside to a car for questioning. Fuhr testified that he gave Riggs her *Miranda* rights and they talked for more than 20 minutes. During the conversation, she denied any involvement in the robbery and gave an alibi for her whereabouts that morning.

Fuhr stated that after a restroom break, Riggs informed him that she did not want to talk any further without assistance of legal counsel. Fuhr said he terminated the con-

[*] Hon. James L. Foreman, of the Southern District of Illinois, is sitting by designation.

versation, but stated that Riggs asked him what he would do next. He told her that he intended to check out her alibi, and said that she asked him to let her know the results of his investigation.

Riggs testified that officer Frank drove her to the police station and during the ride, Frank suggested that Riggs cooperate with the FBI and to think about the baby she was carrying. Riggs said that at one point, Frank asked her, "How could you do this?" There was no indication that Riggs responded to these statements in any way. Frank was not called to testify during the suppression hearing by either party.

There is conflicting testimony as to what happened after Riggs arrived at the police station and was placed in an interrogation room. Riggs stated that she was under the supervision of police officer Edward Hart and that he and Fuhr assumed a good-cop, bad-cop posture with her. She stated that she was also accessible to numerous other law enforcement officers who initiated communication with her while she was in the interrogation room. But she did not testify as to the content of the communications with any officers other than Fuhr and Hart.

Riggs stated that Hart told her that once she went to jail, her child would be placed in a foster home. Hart's version of the events differed slightly. He testified that Riggs had asked him a number of questions, particularly about what would happen to her baby. He said he told her that if a person is in jail when they have a child, the authorities generally try to place the child with a relative. Otherwise, the child would be placed in a foster home.

Riggs stated that she was denied any food until she agreed to provide a statement about her involvement in the robbery. Riggs's mother testified that she had asked officers to make sure her daughter was given food because she was pregnant. She stated that the officers told her that Riggs would get whatever she wanted after she made a confession. She also stated that officers talking among themselves in the hall had stated that Riggs would not get anything until she signed a confession.

This evidence was contrary to the testimony of both Hart and Fuhr, who stated that they had asked Riggs several times throughout the morning whether she needed anything. She requested a glass of water, but did not ask for food until after she had given her statement. There was no evidence that Riggs was aware of the statements allegedly made to her mother or overheard by her mother.

It is undisputed that at one point during the morning, Fuhr stuck his head into the interrogation room and told Riggs that her alibi did not check out. Riggs had told Fuhr that she was paying a bill at a service station at the time that the robbery took place. However, Fuhr informed her that a videotape from the service station showed that she did not arrive there until well after the time of the robbery. Fuhr stated that he had given this information to Riggs because she had asked him to let her know the results of his investigation. He testified that he merely presented the information and then left the room. Riggs, however, stated that Fuhr then asked her, "What do you say to this?" or "Now you gave us this lie. What more can you give us to prove where you were at ... what are you going to tell us this time?" Riggs apparently did not say anything to Fuhr at that time.

Some time later, Riggs asked Hart what had happened to Thomas. When told that he was taken into custody, she asked to speak to him. Hart told her that he did not have the authority to allow her to visit with Thomas, but that she would have to obtain permission from Fuhr. Riggs then told Hart that if the FBI would allow her to talk with Thomas, she would give a statement. Hart contacted Fuhr, who readvised Riggs of her *Miranda* rights, which she acknowledged on an FBI form. He also added language to the form indicating that Riggs had requested to talk to Fuhr after asking for an attorney, but that she had changed her mind of her own free will and did not want an attorney at this time.

In her statement to Fuhr, Riggs did not implicate Thomas, but stated that she had driven a person by the name of "Calvin" to the bank. After making the statement, she

ate lunch at 2:25 p.m. and was allowed to talk briefly with Thomas. Later that. day, after appearing before the magistrate judge and making a proffer to the government with appointed counsel present, she was taken to the Winnebago County Jail. As they were leaving the FBI office, she asked Fuhr what happened to Thomas. When he told her that Thomas had confessed and was in custody, Riggs cursed Thomas but then stated that she knew what she was doing when she got into this. She then stated, "If you can't do the time, don't do the crime."

Riggs moved to suppress both her written statement and the subsequent oral statement. She claimed that the FBI violated her rights by initiating communications with her after she had invoked her right to remain silent and to have the assistance of an attorney. She further argued that she did not voluntarily waive her fifth and sixth amendment rights before making the statement.

After hearing the evidence at a suppression hearing, the district court found that Riggs's testimony about the alleged misconduct by the police officers was not credible. Thus, the court relied upon the testimony of Fuhr and Hart, which the court found to be the most credible. The court, therefore, concluded that Agent Fuhr had not reinitiated interrogation of Riggs following her assertion of her right to an attorney, but that Riggs herself had reinitiated the conversation. The district court further found that after reinitiating the dialogue with the agents, the defendant knowingly and intelligently waived her right to counsel and her right to remain silent. Accordingly, the court denied the defendant's motion to suppress.

Shortly before trial, the government filed a motion in limine seeking a court order to bar Riggs from presenting any evidence or arguing to the jury that her alleged conduct was the product of coercion.[1] Following a hearing, the district court determined that there was sufficient evidence to present the defense to the jury. However, to prevent a series of mini-trials regarding each specific

incident of abuse, the court limited Riggs to general testimony regarding the beatings and prohibited her from. discussing the details of every incident. The court, therefore, refused to admit evidence that Riggs had once fired a weapon at Thomas to defend herself and refused to admit medical records that were intended to corroborate Riggs's testimony that she had been beaten to the point of requiring medical attention.

The court also refused to allow testimony by a domestic violence counselor regarding the battered wife syndrome and sustained the government's objections to testimony that Thomas had boasted about the robbery but never mentioned Riggs in his plans. The defendant claims that all of this evidence should have been admitted because it was relevant and non-repetitive.

The jury convicted Riggs on both counts. Thomas entered a guilty plea to the two counts against him.

### Defendant Riggs's Claims

Riggs claims that the district court erred in refusing to suppress her statements and in limiting the amount of evidence that she was allowed to present concerning her coercion defense. The standard of review for a district court's factual determinations made after a suppression hearing is the clearly erroneous standard. *United States v. Doubet*, 969 F.2d 341, 343 (7th Cir.1992). However, to the extent that legal determinations factor into a suppression ruling, they are subject to *de novo* review. *Id.* The district court's evidentiary rulings should be reversed only if they constitute a clear abuse of discretion. *United States v. Martinez*, 937 F.2d 299, 307 (7th Cir.1991).

### A. Motion to Suppress

■ The defendant challenges the district court's denial of her motion to suppress on two grounds: (1) that the statements were inadmissible because they were the product

---

1. Shortly after the government filed its motion, the defendant filed a notice of intent to present a mental state defense pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure. Defendant's counsel subsequently withdrew the mo-

tion, stating that while the.defendant intended to present a coercion defense, she did not intend to present any expert testimony on the issue. Therefore, no notice was necessary under Rule 12.2.

of improper police interrogation in violation of her *Miranda* rights; and (2) that, under the totality of the circumstances, she had not waived her right to remain silent until she was assisted by counsel.

In support of her first argument, the defendant relies upon the Supreme Court's landmark decision in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), which held that:

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with police.

Under the bright-line test of *Miranda*, "[a]ny statements obtained during custodial interrogation conducted in violation of [the *Miranda*] rules may not be admitted against the accused, at least during the [government's] case in chief." *Fare v. Michael C.*, 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979).

The defendant argues that Special Agent Fuhr's comment to her regarding her alibi constitutes improper interrogation under the *Edwards* standard. Although Fuhr did not ask any questions at that time, the Supreme Court has held that the term interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted). The defendant argues that Fuhr knew that he was reasonably likely to

elicit an incriminating response from Riggs when he told her about the evidence that contradicted her alibi.

There is considerable disagreement among the federal and state courts as to "[w]hether police may confront a suspect with evidence against him, outside the range of normal arrest and charging procedures, without engaging in the 'functional equivalent' of interrogation...." *Lewis v. Florida*, 486 U.S. 1036, 108 S.Ct. 2025, 100 L.Ed.2d 612 (1988) (White, J., dissenting from denial of the petition for writ of certiorari). However, while there may be some question as to the propriety of allowing police officers to provide *unsolicited* information regarding the evidence they have found, this case presents a very different situation because the defendant herself had asked Fuhr to let her know the results of his investigation. Based upon Fuhr's version of the events, which the district court found to be true,[2] Fuhr did nothing more than provide the information; he left the room without asking any questions. Under these circumstances, the district court correctly found that Fuhr had not reinitiated interrogation of the defendant, but that the defendant herself had initiated the communications. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (holding that no *Edwards* violation occurred when the accused initiated the conversation by asking officers a question that "evinced a willingness and a desire for a generalized discussion about the investigation....").

■ The defendant also attempts to rely upon her own testimony that police officer Frank had interrogated her enroute to the police department. Because her testimony was unrebutted, she argues that the government failed to carry its burden of proving that Frank did not initiate improper communications and that the defendant validly waived her rights. However, the defendant did not present this argument to the district court and, therefore, has waived the right to argue it upon appeal. *United States v. Eas-*

**2.** Although Riggs claims that she did not make such a request, the district court found that her testimony was not credible. Based upon the record—particularly the defendant's track record

for providing false information—the district court's credibility determination was not clearly erroneous.

*ley,* 977 F.2d 283, 286 (7th Cir.1992). Nevertheless, we may review such matters for plain error. *United States v. Ayala–Rivera,* 954 F.2d 1275, 1277 (7th Cir.1992).

■ The defendant has not shown that she made any statement in response to Frank's alleged questioning. Although Riggs eventually agreed to give a statement to Fuhr, several hours had passed since her encounter with Frank, and the defendant had steadfastly maintained her silence during that period. Thus, even if Frank had improperly questioned the defendant, it cannot be said that Riggs's statements were obviously the product of Frank's questions. As a result, we find no plain error in the district court's determination.

■ That does not end the inquiry, however. Although there was no *Edwards* violation, the district court still had to determine whether Riggs had validly waived her rights when she agreed to make a statement and respond to Fuhr's questions during the interview.[3] Riggs concedes that her waiver was knowing and intelligent. But, despite the fact that she signed a written waiver form, she contends that the waiver was not voluntary because her will had been overborne by the totality of the circumstances.

The defendant argues that (1) she was informed that her unborn child would end up in a foster home; (2) she was denied the opportunity to eat until she made a statement; (3) she was subjected to numerous visits by other agents or officers in the interrogation room; and (4) Fuhr and Hart subjected her to a good cop/bad cop routine. However, the district court found Riggs's testimony on these issues to be unbelievable. Concluding that there was no misconduct or other acts of coercion by the officers, the court held that Riggs had voluntarily waived her rights when she agreed to make a statement. We find no clear error in the district court's factual findings and affirm its legal conclusion that the defendant had validly waived her rights.

Based upon this finding, there is no merit to the defendant's argument that her second statement—the one she made after she learned that Thomas had confessed—should be excluded as fruit of the poisonous tree.

**B. Exclusion of Evidence to Support Coercion Defense**

■ Riggs argues that the district court overstepped its authority in excluding evidence that she had offered to support her coercion defense. She acknowledges that the district court was required to determine whether the defendant had sufficient evidence to present the defense. *See, e.g., United States v. Tanner,* 941 F.2d 574, 587 (7th Cir.1991) ("[A] defendant is entitled to have a jury consider any theory of defense which is supported by law and has some foundation in the evidence, even though such evidence may be weak, insufficient or of doubtful credibility."), *cert. denied,* — U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992). However, she argues that the district court's authority was limited to denying a jury instruction on her defense if there was insufficient evidence of it. In her view, the court could not limit the jury's opportunity to hear all of the non-repetitive, relevant evidence available to support the defense.

We agree with the government that the district court properly excluded the evidence of specific conduct—i.e., the prior shooting incident between Riggs and Thomas and the medical records showing that Riggs had sought medical treatment as a result of prior beatings from Thomas—under Rule 403 of

---

3. If a defendant initiates the communications with police and makes an entirely volunteered statement, there is no interrogation and no need to determine whether there was a valid waiver. *Edwards,* 451 U.S. at 486, 101 S.Ct. at 1886. The circumstances change slightly, however, if the police officers begin asking questions.

  If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

  *Id.* n. 9.

the Federal Rules of Evidence. Whatever marginal relevance such evidence might have is clearly outweighed by the danger of confusion of the issues and considerations of undue delay, waste of time, and unnecessary presentation of evidence that would result if the defendant were allowed to conduct mini-trials of each alleged incident of abuse. The defendant was allowed·to present extensive testimony concerning the violent nature of her relationship with Thomas and general statements regarding abuse she had sustained in the past. The district court, therefore, did not abuse its discretion in refusing to allow the defendant to present evidence regarding each specific incident of abuse.

▪ The defendant also challenges the district court's refusal to allow a witness to testify that Thomas had boasted about the robbery but never mentioned Riggs's involvement. The district court had sustained the government's objection that such evidence constitutes inadmissible hearsay. Although the defendant argues that the evidence was relevant and non-repetitive, this argument does not address the fact that the evidence was otherwise inadmissible on hearsay grounds. Accordingly, the defendant's argument is without merit.

▪ The defendant's final objection concerns the district court's refusal to allow certain testimony from domestic violence counselor Susan Hall, who had worked with Riggs at a shelter for abused women. When the district judge sustained the government's objection to Hall's testimony, the defendant made an offer of proof, stating that the testimony was intended to show that the defendant was the victim of mental brainwashing—i.e., that it is difficult for abused women to leave the relationship and, as a result, they often do things against their will in these relationships. Counsel for the defendant further suggested that Hall's testimony would show that abused women do not necessarily want to break the relationships, but want to merely break the violence of the relationship. Thus, counsel argued that the evidence was probative to explain why Riggs continued her relationship with Thomas even after he had been incarcerated and, therefore, was no longer a physical threat to her.

The defendant argued that Hall's testimony should be allowed under Rule 701 of the Federal Rules of Evidence as opinion testimony by a lay witness. However, it is clear that the defendant was attempting to solicit testimony·of an expert nature regarding the defendant's mental state at the time of the robbery. The defendant had withdrawn her notice of an intent to raise a mental state defense and counsel had expressly stated to the court that he did not intend to present any expert testimony on·the issue. As a result, the government did not obtain its own expert evaluation of the defendant. Under these circumstances, it would be highly prejudicial to allow the defendant to bring this expert testimony through the back door under the guise of lay opinion testimony.

Furthermore, as the district court pointed out, there was no evidence that the defendant herself was suffering from a mental defect. The defendant's offer of proof merely indicated that Hall would testify that abused women in general exhibited certain characteristics. Accordingly, we find that the district court did not abuse its discretion in excluding this testimony.

### Defendant Thomas's Sentence

▪ Thomas argues that the district court erred in applying a two-level increase to his sentence for obstruction of justice pursuant to section 3C1.1 of the Sentencing Guidelines for supplying false information to the probation officer during the presentence investigation. The Court's factual determination regarding the enhanced sentence for obstruction of justice is reviewed under a clearly erroneous standard. "[T]he standard of review for the sentencing court's factual findings is clearly erroneous, while the standard of review for the sentencing court's application of the Guidelines to the facts is due deference." *United States v. Randall,* 947 F.2d 1314, 1320 (7th Cir.1991).

Section 3C1.1 of the Guidelines provides that "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense by 2

levels." U.S.S.G. § 3C1.1. The commentary to this section provides examples of the types of conduct to which this enhancement applies. Included is "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." *Id.* comment. (n. 3(h)). The commentary further suggests that enhancement is *not* appropriate for "providing incomplete or misleading information, *not amounting to a material falsehood,* in respect to a presentence investigation...." *Id.* comment. (n. 4(c)) (emphasis added).

Thomas concedes that he provided false information to the probation officer regarding his date of birth and date of high school graduation and that he had failed to disclose his prior arrest record and his dishonorable discharge from the military. However, he argues that his false statements were neither willful nor material.

■ The defendant relies heavily on *United States v. Lofton,* which defined willful obstruction as follows:

> Sentencing Guidelines § 3C1.1 contains a clear *mens rea* requirement that limits its scope to those who "willfully" obstruct or attempt to obstruct the administration of justice. The meaning of "willful" is often determined by its context.... As applied by section 3C1.1, the term "wilfully" requires that the defendant "consciously act with the *purpose* of obstructing justice."

905 F.2d 1315, 1316–17 (9th Cir.) (emphasis in original) (citations omitted), *cert. denied,* 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990). The defendant argues that there was *no* evidence that his actions were designed to intentionally obstruct the administration of justice. *Id.* However, as pointed out in *Lofton,* the Guidelines provide that furnishing false information to a probation officer during a presentence investigation is itself conduct which constitutes obstruction of justice. Therefore, if the defendant willfully provided false information, then he willfully obstructed or attempted to obstruct the administration of justice.

Based upon the probation officer's testimony, it seems clear that the defendant knew that he was providing false information. Although he now claims that his conduct was not willful, there is nothing in the record to suggest that his false statements were made by mistake or negligence or that the defendant's actions were taken for any purpose other than obstructing justice by providing false information.

■ To show that he did not intend to obstruct justice, the defendant points to the fact that he promptly called the probation officer to correct the information. The government, however, points out that the defendant first gave the false information to the probation officer in an initial interview on August 7, 1992. The probation officer subsequently conducted a second interview on September 3, 1992, at which time the probation officer informed the defendant that false information could lead to an obstruction of justice enhancement. The defendant then corrected the information by calling the probation officer on September 4, 1992. Contrary to the defendant's argument, this evidence shows that he knew that the information was false and did not intend to provide the correct information until he learned that he could be penalized for providing the false information.

■ In arguing that his false statements were not material, the defendant relies upon the Guidelines commentary, which states that the term "material" refers to "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 comment. (n. 5); *see also United States v. Rodriguez,* 943 F.2d 215, 218 (2d Cir.1991) ("[t]he definition of a 'material' statement embraces false statements that would tend to affect a defendant's sentence...."). The defendant argues that the information concerning his date of birth, date of high school graduation, and his discharge from the military would have no bearing on the sentence he received under the Guidelines.

■ To the contrary, the false information regarding the defendant's identity was clearly material because it thwarted the probation officer from investigating the defendant's personal and criminal history, which are major factors in determining a defen-

dant's sentence. The circumstances of a defendant's discharge from the military also are material because the Guidelines provide that a district court, in determining whether to sentence a defendant to the high or low end of a sentencing range, should consider the factors in 18 U.S.C. § 3553. Among those factors is the history and characteristics of a defendant, which could include a defendant's dishonorable discharge from the military. *Id.* § 3553(a)(1).

Finally, the Seventh Circuit has held that providing false criminal history during a presentence investigation constitutes obstruction of justice. *United States v. Delgado,* 936 F.2d 303, 306 (7th Cir.1991) ("It is difficult to conceive of a more material falsehood than a defendant lying to a probation officer concerning the extent of his criminal record during the presentence investigation."), *cert. denied,* —— U.S. ——, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). Although the defendant's false information concerned arrests as opposed to actual convictions, the misinformation is nonetheless still material because section 4A1.3(e) provides that an arrest may be considered in determining whether an upward departure is warranted. *See United States v. Garcia,* 902 F.2d 324, 326 (5th Cir.1990) (affirming obstruction enhancement based on defendant's false statements regarding prior arrest); *cf. United States v. Ojo,* 916 F.2d 388, 390, 392–93 (7th Cir.1990) (upholding obstruction enhancement where a defendant provided false information concerning her "name, date of birth, length of residence in the United States, current address, family history, financial status and arrest record" to a pre-trial services officer during an investigation concerning setting an appearance bond); *United States v. Gaddy,* 909 F.2d 196, 199 (7th Cir.1990) (upholding obstruction enhancement where defendant provided a false name to FBI agents and lied about his arrest and fingerprint records).

The defendant's conduct is not mitigated by the fact that the district court ultimately did not consider the prior arrest in imposing sentence upon the defendant. *See United States v. Donine,* 985 F.2d 463, 465 (9th Cir.1993) (rejecting argument that the false criminal history defendant provided had no effect on his final sentence); *Garcia,* 902 F.2d at 326 (affirming obstruction enhancement based on district court's finding that defendant intentionally provided false statements regarding prior arrest even though the court ultimately found there was conflicting evidence about the arrest). Nor can he escape the obstruction enhancement by showing that he later recanted his false statements. *See Gaddy,* 909 F.2d at 199 (rejecting defendant's argument that his conduct had no effect on the investigation because he had recanted his lie two days later; the court held that section 3C1.1 applies to *attempts* to obstruct justice as well as actual obstruction).

Based upon this record, the district court's factual findings regarding the defendant's false statements were not clearly erroneous. We further find that the lower court did not abuse its discretion in applying the section 3C1.1 obstruction enhancement to the defendant's sentence.

### Conclusion

For the foregoing reasons, we find no error in the district court's rulings denying defendant Riggs's motion to suppress and refusing to allow her to present certain evidence in support of her coercion defense. We further find that the district court properly applied an obstruction of justice enhancement to defendant Thomas's sentence. Accordingly, we AFFIRM Thomas's sentence and Riggs's conviction and resulting sentence.