919 So.2d 520 (2005)
Carmen PERRINE, Appellant,
v.
The STATE of Florida, Appellee.
Nos. 3D05-645, 3D04-2496.
District Court of Appeal of Florida, Third District.
December 14, 2005.
Rehearing and Rehearing Denied February 8, 2006.
*521 Bennett H. Brummer, Public Defender, and Thomas Regnier, Assistant Public Defender, for appellant.
Charles J. Crist, Jr., Attorney General and Michele Samaroo, Assistant Attorney General, for appellee.
Before CORTIÑAS and ROTHENBERG, JJ., and SCHWARTZ, Senior Judge.
Rehearing and Rehearing En Banc Denied February 8, 2006.

AMENDED OPINION
SCHWARTZ, Senior Judge.
The primary issue on this appeal from convictions for burglary of a dwelling and grand theft is the admission of obviously false exculpatory statements made to the police concerning the stolen firearms subsequent to (a) the defendant's initial invocation of her Miranda rights;[1] (b) subsequent improper further questioning by the police;[2] (c) an interval of at least thirty *522 *523 minutes during which defendant was free to, and did, leave the police station, and then returned voluntarily;[3] and (d) her initiation of questioning on her own and *524 then specifically waiving her Miranda rights to an attorney and to remain silent.[4]
While we certainly agree that the (quite extensive) post-Miranda invocation questioning was improper, indeed condemnable, see Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983)(Edwards[5] rule was "designed to protect an accused in police custody from being badgered by police officers"); Pirzadeh v. State, 854 So.2d 740 (Fla. 5th DCA 2003), we hold, distinguishing such cases as United States v. Gomez, 927 F.2d 1530, 1539 n. 8 (11th Cir.1991),[6] that the trial court did not err in finding that the tainted post-Miranda interrogation had been dissipated. The cases indicate that, under given circumstances, either a break in custody or a lapse of time *525 may be sufficient to obviate the effect of improper police interrogation. See Palaggi v. Chrans, 221 F.3d 1339 (7th Cir.2000) (unpublished opinion) ("Palaggi's confession in Illinois, initiated by him two days after the Edwards violation in Florida and after receiving Miranda warnings, was sufficiently removed from any taint."); Holman v. Kemna, 212 F.3d 413, 419 (8th Cir.2000) (defendant-initiated confession given morning after post-invocation of counsel questioning admissible), cert. denied, 531 U.S. 1021, 121 S.Ct. 587, 148 L.Ed.2d 502 (2000); Hill v. Brigano, 199 F.3d 833, 842 (6th Cir.1999), cert. denied, 529 U.S. 1134, 120 S.Ct. 2015, 146 L.Ed.2d 964 (2000); United States v. Thomas, 11 F.3d 1392 (7th Cir.1993); Henderson v. Singletary, 968 F.2d 1070 (11th Cir.1992), cert. denied, 506 U.S. 1007, 113 S.Ct. 621, 121 L.Ed.2d 554 (1992); United States v. Evans, 917 F.2d 800, 805 (4th Cir.1990), overruled on other grounds by United States v. Lancaster, 96 F.3d 734 (4th Cir. 1996), cert. denied, 519 U.S. 1120, 117 S.Ct. 967, 136 L.Ed.2d 852 (1997); Dunkins v. Thigpen, 854 F.2d 394, 397 (11th Cir.1988), cert. denied, 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); see also Fitzpatrick v. State, 900 So.2d 495, 512 (Fla. 2005); Parker v. State, 873 So.2d 270 (Fla. 2004), cert. denied, 543 U.S. 1049, 125 S.Ct. 868, 160 L.Ed.2d 768 (2005); Keys v. State, 606 So.2d 669 (Fla. 1st DCA 1992); Gonzalez v. State, 449 So.2d 882 (Fla. 3d DCA 1984), review denied, 458 So.2d 274 (Fla. 1984); cf. Gomez, 927 F.2d at 1539 (invalidating defendant-reinitiated questioning following post-Miranda interrogation in absence of significant passage of time or release from custody); United States v. Walker, 624 F.Supp. 103 (D.Md.1985) (defendant's response to officers one hour after Edwards violation insufficient to constitute waiver of right to counsel); Blake v. Maryland, 381 Md. 218, 849 A.2d 410, 422 (2004) (no break in custody and twenty-eight minute time lapse), cert. dismissed as improvidently granted, ___ U.S. ___, 126 S.Ct. 602, ___ L.Ed.2d ___ (2005); see generally McNeil v. Wisconsin, 501 U.S. 171, 177, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991) (dictum) (suspect's responses to post-invocation of counsel questioning in counsel's absence presumed involuntary "assuming there has been no break in custody"); Edwards; Craig v. State, 599 So.2d 170, 171 (Fla. 3d DCA 1992), review denied, 605 So.2d 1263 (Fla.1992). Because both of these factors are involved in this case, affirmance is clearly in order.
Affirmed.
NOTES
[1] The videotaped and transcribed interview of Perrine reflects the following:

Detective Dillon Corr: Do you wish to have an attorney present with you at this time?
The Witness [Defendant Perrine]: Uh, yes. Yes, just to be safe.
Detective Dillon Corr: Okay.
[Defendant Perrine]: Can we do this tomorrow, or something? I have something 
Officer Bonnie Levin: No, No.
Detective Dillon Corr: We do this on my time frame. Sign the paper.
[Defendant Perrine]: For what?
Detective Dillon Corr: To say that you want an attorney.
Officer Bonnie Levin: We are done. We won't talk. We are done.
[Defendant Perrine]: So, the next time you guys come out I will be with my attorney?
Officer Bonnie Levin: Yeah, yeah, your attorney. But I don't want to say anything after the fact. We already told you ahead of time.
[Defendant Perrine]: Yeah, I know, but the next time that you guys come, I am going to be with my attorney.
(Emphasis added).
[2] Immediately after Perrine requested counsel, the following occurred:

Detective Dillon Corr: I will probably come and visit you. I am going to lay it all out for you.
If you want your attorney present, that is fine. If you want to hear what we have to say, you can. You still don't have to talk to us. Okay? That is the bottom line.
You need to understand your rights. All right? If you decide to answer a question, now, without a lawyer, you still have the right to stop the interview at any time.
You also have the right to stop the interview at any time to talk to a lawyer. So, if you are willing to hear us out, and let us present our case to you, then you can make the decision, once we present our case that is fine. Is that what you want to do?
That is where I am seeing you going here. You want to know what we have before you do anything.
[Defendant Perrine]: I don't know. (inaudible).
Detective Dillon Corr: All right. Then, let me show you what I have. And, then, you can make the decision on what you want to say. Is that a fair assumption?
* * *
Officer Bonnie Levin: No, no, so, you have asked for a lawyer. So, we are in a position where we have to say to you. We can't tell you anything. You can't tell us anything, unless you have a lawyer present. All right.
If you choose to hear what we have to say, at any time during that, you can say, okay, you know what, I want my lawyer. I am not talking.
Just because you say that you choose to hear what we have to say, does not mean that somewhere down the road, in five or ten minutes that you can't stop us, at any time.
So, what I am saying is that you asked for a lawyer right now. We don't talk. We get up and walk out. If you hear what we have to say, and then decide that you want a lawyer, then we stop.
* * *
Officer Bonnie Levin: I am not going to give you legal advice. I am going to tell you from a law enforcement standpoint. We have to go forward. I have been straight with you.
I want your rights to be exactly as you deserve them and how you get them. But, I also want you to help yourself. I want to see you cooperate today because I think that you have information that you can give us.
[Defendant Perrine]: But, that is the honest truth.
Officer Bonnie Levin: I don't know. I can't ask you questions. I don't know.
Detective Dillon Corr: Do you want to talk to us?
Officer Bonnie Levin: So, if you want to talk to us or if you want to hear what we have to say, and we can ask you questions, that's fine.
But the lawyer is kind of like, what I call the wall. Once you say lawyer, it is like, this wall comes up. We don't talk to you. I don't screw around with that at all.
If you want to talk
[Defendant Perrine]: So, you are saying we can talk. And, then,I can say stop, whenever I want?
Officer Bonnie Levin: Absolutely.
Detective Dillon Corr: You can decide what you want to answer and what you don't want to answer.
Officer Bonnie Levin: You can say I don't want a lawyer right now. But, if I want a lawyer in five minutes, the wall comes up.
The lawyer is kind of like your, uh; I don't want to talk anymore. That is like your card to pull. I don't want to talk. We are not going to mess around with that.
I am not going to violate your rights; right now. And, I will tell you, the reason why we are not going to violate your rights is that we already know what happened. We just want you to help us put it together.
[Defendant Perrine]: But, like I said, I really don't know anything.
Officer Bonnie Levin: Don't say anything.
Detective Dillon Corr: Carmen, if you want to talk to us, I will make it as simple as I can. If you want to talk to us. Sign right on the X. If you want to hear what we have to say and to see if you want to answer our questions. Sign right on the X.
Officer Bonnie Levin: Read it first; then sign it.
Detective Dillon Corr: It is the same form that I just read to you.
Officer Bonnie Levin: And, you know what, this is what we are going to do. So your head is not spinning, we are going to leave this form with you. We are going to walk out for a minute and then come back. Okay?
[Defendant Perrine]: No, that is fine. You don't have to leave.
Detective Dillon Corr: Yes, I think that is the best idea.
[Defendant Perrine]: No, I just, you explained it nice easy.
Officer Bonnie Levin: I am telling you. I am not going to deny you your rights. If you hear what we have to say and you want a lawyer, I want [sic] screw around. We are stopping. Okay?
[Defendant Perrine]: I am not b______s_______.
Officer Bonnie Levin: This is what I think you should do.
[Defendant Perrine]: I am not b______s_______. I am not b______s_______. I work every day. I work eight to four. Alek drops me off sometimes. (Inaudible).
I don't know nothing. And that is the honest truth. The only thing is, the kids, (inaudible).
Officer Bonnie Levin: Right.
[Defendant Perrine]: (Inaudible). But, when we walked in there, the place was destroyed. The place was trashed. Those kids justjust destroyed it.
Officer Bonnie Levin: But, you know what, this is the problem I have. I can't even ask you those questions; until what's called waiving your rights.
So, I would rather, if you were to ask me what you should do. You should do what is in your best interest. If you don't have things to tell us, but you want us to ask you questions, then you sign it.
If you just want to get up and walk out, then you say see you guys later.
[Defendant Perrine]: (Inaudible) If I talk to my lawyer, would it be okay, if I come back and talk to (Inaudible)?
Officer Bonnie Levin: Yes.
* * *
[Defendant Perrine]: I am the one getting f_____.
Officer Bonnie Levin: Right.
[Defendant Perrine]: (Inaudible). All I want to do is to talk to my lawyer first. I want to ask him what he thinks.
Officer Bonnie Levin: That's fine.
[Defendant Perrine]: Okay, that's it. (Inaudible).
Officer Bonnie Levin: You and your lawyer will have to come and talk to me, but what happens; it just makes it a little bit more difficulty.
Because now, I have to bring in attorneys from the Federal side too. We got to bring everybody in now, because it is not that
[Defendant Perrine]: I am being straight up.
Officer Bonnie Levin: It is not that you are being nice. You are being straight up. But I can't say that you are being cooperative. Which means
[Defendant Perrine]: Well, if I don't know nothing about it. What the h___ are you going to do about it? What the h___ are you going to do, if I don't know nothing about it?
Officer Bonnie Levin: But, I can't even ask you about it. I can't even ask you about what you don't know.
[Defendant Perrine]: (Inaudible).
Officer Bonnie Levin: That is the whole thing. We can't ask you anything. What happens is once you get your lawyer in, he gives you advice on when to talk and when not to talk.
[Defendant Perrine]: Is there any paper work that I can get to take to him? Or is it that I just tell him what is going on?
Officer Bonnie Levin: Tell him what's going on. Tell him that there was a burglary and a bunch of guns got taken. And, a bunch of other stuff and that there are at least five or six witnesses that put you in the house.
[Defendant Perrine]: That is a crock of s___. All right, I will do that.
Officer Bonnie Levin: Okay.
[Defendant Perrine]: You should get the recorder.
Officer Bonnie Levin: No, no, he is right here.
She won't cooperate.
Detective Dillon Corr: Okay, that is fine. No problem. Bonnie, can I put upon you for urine testing?
[Defendant Perrine]: I told her that when I talked to the lawyers, that I would come back and talk to you.
Detective Dillon Corr: That is fine.
Officer Bonnie Levin: I told her that we are not messing around with her rights. And, we can't ask her what she knows or doesn't know.
[3] At the suppression hearing, Officer Levin testified as follows:

Q. [State Attorney: Was Perrine e]ver told she could not leave?
A. No. In fact, she left and went to go meet the bail bondsman at the jail [to bail out a friend], and then about thirty minutes later I walked over in the general area, saw her sitting there and she said that the guy wasn't there, she felt like she had missed him and
Q. The guy, you mean
A. The bail bondsman. I never saw him. So she came back and she asked if we would call him and to see where he was and if he would meet with her again.
Q. Did you do that?
A. Detective Corr did, I believe.
Q. She came back to where?
A. The substation.
Q. Was she handcuffed and shackled?
A. No. She came back, walked back on her own.
Q. What happened after she came back to the substation the second time?
A. I believe Detective Corr was calling the bail bondsman to figure out what time they could meet up, and at that point she wanted to speak again, so I know I reread Miranda and pretty sure we started the tape again, so I went through her Miranda rights again.
(Emphasis added).
[4] When Perrine returned to speak to the officers, the following ensued:

Officer Bonnie Levin: A court attorney will be appointed for you, before questioning, if you wish.
Do you wish to have an attorney present, at this time?
[Defendant Perrine]: (Inaudible).
Officer Bonnie Levin: You said no, right? No, no, you said no, right? Not putting it in your head.
[Defendant Perrine]: No.
Officer Bonnie Levin: Okay, I'm going to ask you again, after I read you this.
If you decide to answer questions now, without an attorney present, you still have the right to stop answering at any time.
You also have the right to stop answering at any time until you talk to a lawyer. Do you fully understand that?
[Defendant Perrine]: Yes.
Officer Bonnie Levin: Okay. So, I am going to ask you. Do you wish to have an attorney present, at this time?
[Defendant Perrine]: No.
Detective Dillon Corr: Okay, would you sign on that X?
Officer Bonnie Levin: Yeah. Do me a favor. Just.
I don't know if you guys do this. I am going to have you read it. Initial each one; and then, sign the bottom. Okay?
I told her, the jail called over, when Tyrone was out so she could get this guy out.
[Defendant Perrine]: So, what do I do?
If I know it is signed, do I go up there?
Officer Bonnie Levin: To the (inaudible)?
[Defendant Perrine]: No, no, no, no.
Officer Bonnie Levin: Oh, to go where you told me where the guns were?
Okay, I will tell you that after.
Do me a favor. Read that. And then, initial by it.
[Defendant Perrine]: All of this?
Officer Bonnie Levin: Yeah, I am reallylike that because, I want you to understand what you are signing.
Carmen really understands that I want the guns back. In addition to everything else. Cause, I am concerned about them being on the street.
So, she said that, after you talk to her, she is willing to, uh, talk to Alek, about where the guns are.
[Defendant Perrine]: You are going to get him out?
Officer Bonnie Levin: Right.
[Defendant Perrine]: From wherever he is.
Officer Bonnie Levin: Okay. All right. Why don't you tell us what happened, on your end. And, then, we will ask you questions, if you don't mind. Tell us your story.
[5] Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
[6] In Gomez, 927 F.2d at 1539 n. 8, the court stated that

It may be possible for enough time to elapse between the impermissible further interrogation and the "initiation" that the coercive effect of the interrogation will have subsided. Here, however, the government does not contend, nor could it, that the few minutes during which Gomez was being escorted to the holding cell could constitute time sufficient to overcome the coercion of the interrogation.