DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**OCKEVE SINCLAIR,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-2815

[April 14, 2021]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Timothy L. Bailey, Judge; L.T. Case No. 16-5754CF10A.

Carey Haughwout, Public Defender, and David John McPherrin, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Alexandra A. Folley, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Ockeve Sinclair appeals his conviction for first-degree murder. We affirm and write to address one issue—the admissibility of Sinclair's statements to a police detective. We hold that the trial court properly denied Sinclair's motion to suppress a May 12, 2016 statement to the police.

### *Background*

Sinclair was charged along with a codefendant, Brian Fairweather, who accepted a plea bargain. Sinclair was convicted after a jury trial.

The murder victim, who worked as a corrections officer, was shot in his apartment, once in the mouth and three times to the chest. A witness saw Sinclair, wearing a red hoodie, and Fairweather, wearing a black hoodie, in the area of the victim's apartment between 11:00 a.m. and 2:00 p.m. A surveillance video from the apartment complex showed two men, one in a red hoodie and the other in a black hoodie, walking toward the victim's apartment. Phone records established that both Sinclair's phone and

Fairweather's phone were near the victim's apartment between 12:30 and 1:30 p.m. When the victim did not show up for work at 2:00 p.m., the corrections facility contacted the victim's mother, who went to the apartment and found her son's body lying in a pool of blood by the front door. She dialed 911.

When police arrived at the apartment, they observed no signs of forced entry. A bottle of bleach was close to the victim's body and the apartment smelled of bleach. The apartment was ransacked. There were items missing from a jewelry case. Although the victim owned a number of guns, no guns were found in his apartment.

During the investigation, a detective learned that the victim might have had a romantic relationship with Fairweather's wife and that Fairweather had a confrontation with the victim a few days before the murder.

Sinclair made statements to an acquaintance, who testified at trial. The acquaintance said he met Sinclair through Fairweather. Sinclair told the acquaintance that he and Fairweather went in the victim's apartment and came back out, but "they didn't have enough stuff." Sinclair said that Fairweather was a coward, who "didn't wasn't to go back inside the house," so Sinclair took a gun from Fairweather and went back inside. Sinclair said that Fairweather did not "have the balls to pull the trigger" and that, after the murder, they cleaned up the place with bleach.

### Sinclair's Statements to Police

Sinclair was interrogated on three occasions: (1) February 16, 2016; (2) March 9, 2016; and (3) May 12, 2016. He moved to suppress all three statements. The trial court granted Sinclair's motion to suppress the March 9, 2016 statement, but denied Sinclair's motion to suppress the other two statements.

On February 16, 2016, Sinclair spoke with a detective and denied involvement in the murder. Sinclair also provided his phone for analysis.

On March 9, 2016, the detective interviewed Sinclair at the Pembroke Pines police station without first giving *Miranda* warnings. The detective told Sinclair that the victim's neighbors placed him at the victim's apartment, but Sinclair continued to deny involvement in the murder. Throughout this interview, the detective repeatedly denied Sinclair's requests to leave. The trial court suppressed this statement, concluding that it was made without *Miranda* warnings and that Sinclair was in custody, since he was not free to leave.

2

On May 12, 2016, following Sinclair's arrest in Fort Pierce for first-degree murder, a Fort Pierce police officer contacted the detective and told him that Sinclair requested to speak with him. The detective drove to Fort Pierce to interview Sinclair. Sinclair received *Miranda* warnings and executed a written waiver.

In the May 12, 2016 statement, Sinclair claimed that he was at the victim's apartment complex to sell weed. At first, he denied that he went inside the victim's apartment. Eventually, he admitted that he was inside the victim's apartment, helping Fairweather take the victim's guns. He said Fairweather shot the victim three or four times as the victim entered the apartment. He also claimed that Fairweather took guns and watches from the victim's apartment, while he took boxes of bullets. He admitted to selling Fairweather a .38 revolver about one to three months before the murder, which was the same weapon Fairweather used to shoot the victim. During the interview, he never asked that questioning stop and never asked for a lawyer.

Following a suppression hearing at which both Sinclair and the detective testified, the trial court denied the motion to suppress the May 12, 2016 confession, finding that (1) Sinclair reinitiated the conversation with the detective, (2) he received *Miranda* warnings, (3) he waived his *Miranda* rights, (4) he was not coerced, and (5) he never expressed a desire to end the interrogation. The trial court rejected Sinclair's testimony that he informed the detective over the phone that he did not want to speak to him. The trial court noted that Sinclair spent "the last half hour" of the interrogation "trying to get a deal out of [the detective]," telling the detective that he knew something about other murders and "almost explaining why he wanted to talk to [the detective]." Having watched "the entire visit between [the detective] and Sinclair," the trial court found that the interview was consistent with the State's argument that Sinclair "wanted to talk to [the detective]." A large portion of the May 12, 2016 interview was played for the jury at trial.

### The Detective's Failure to Honor Sinclair's Invocation of His Right to Silence on March 9th Did Not Carry Over to Sinclair's Statement on May 12th

Sinclair argues that because the detective did not scrupulously honor his invocation of his right to silence on March 9, 2016, his subsequent statement on May 12, 2016 was subject to suppression. We disagree.

We hold that the detective's failure to honor Sinclair's invocation of his right to silence on March 9th did not carry over to the May 12th statement.

3

Sinclair initiated the May 12th statement following a significant passage of time and a break in custody between the two statements.

In *State v. Hunt,* 14 So. 3d 1035 (Fla. 2d DCA 2009), the Second District set forth a two-step analysis for determining whether to suppress a suspect's statement to the police after an earlier invocation of his rights:

> Where, as here, a suspect has made statements to the police after invoking his right to remain silent, the correct approach to determining whether the police have scrupulously honored the suspect's right to remain silent may require a two-step analysis. In the first step, courts must decide whether the police continued to interrogate the suspect despite his or her invocation of the right to remain silent. If the police continued the interrogation, then they failed to scrupulously honor the right to remain silent and the resulting statements are inadmissible. Under these circumstances, the court need not proceed to the second step.

> On the other hand, if the interrogation ceased, the court must proceed to the second step of the analysis. In the second step, the court must determine who reinitiated the dialogue. The answer to this question determines what factors the court must examine in resolving the issue.

> * * *

> [W]here it was the suspect who reinitiated the dialogue with the authorities, the inquiry is different. Under these circumstances, the courts consider whether the suspect's decision to change his or her mind and to waive his or her rights by speaking with the authorities was voluntary, knowing, and intelligent.

*Id.* at 1038–39 (citations omitted).

To be sure, *Hunt* contains language stating that if police fail "to scrupulously honor the right to remain silent," then "the resulting statements are inadmissible" and "the court need not proceed to the second step." *Id.* However, this court has observed that *Hunt* "does not directly address a situation where the defendant reinitiated dialogue with the police after an earlier interrogation in which the police did not immediately cease questioning when the defendant invoked his rights." *Calder v. State,* 133 So. 3d 1025, 1032 (Fla. 4th DCA 2014).

Courts that have addressed the "initiation" issue in depth have held that "where law enforcement officers have disregarded a suspect's previously-invoked rights by continuing to interrogate him, a renewal of contact by the defendant will be considered an 'initiation' only if the decision to renew contact was not a 'response to' or 'product of' the prior unlawful interrogation." *Mack v. State*, 765 S.E.2d 896, 903 (Ga. 2014).

For example, in *Calder*, we held that the defendant's reinitiation of the interrogation and waiver of his previously-invoked right to counsel was the product of improper police conduct, as the detective's improper comments reduced the defendant to tears and the defendant's reinitiation occurred less than 10 minutes after the first interrogation ended. 133 So. 3d at 1029–33.

Significant to the analysis in this area, "*either* a break in custody or a lapse of time may be sufficient to obviate the effect of improper police interrogation." *Perrine v. State*, 919 So. 2d 520, 524–25 (Fla. 3d DCA 2005). For example, in *Perrine*, the Third District held that the trial court did not err in finding that the taint of improper questioning had dissipated where (1) the defendant initially invoked her *Miranda* rights, (2) the police improperly continued questioning, (3) the defendant left the police station for 30 minutes and returned voluntarily, and (4) the defendant reinitiated questioning and waived her *Miranda* rights. *Id.* at 521–24.

Similarly, in *Maryland v. Shatzer*, 559 U.S. 98 (2010), the United States Supreme Court held that where a suspect experienced a break in custody of at least 14 days, the rule of *Edwards v. Arizona*, 451 U.S. 477 (1981), does not require suppression. The *Edwards* rule provides that when a suspect has invoked his right to counsel, he should not be subject to further interrogation until either counsel has been made available or the suspect himself initiates further exchanges with the police. In *Shatzer*, the Court ruled that suppression was not required, as 14 days "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." 559 U.S. at 110.

Here, the trial court properly denied Sinclair's motion to suppress his May 2016 statement because, under the totality of the circumstances, he voluntarily initiated this interrogation. Although the detective failed to scrupulously honor Sinclair's invocation of his right to silence during the March 2016 interrogation, the trial court addressed that harm by suppressing that earlier statement. Importantly, the trial court made an express factual finding that Sinclair reinitiated contact with the detective

5

after he was arrested in May 2016, that Sinclair received *Miranda* warnings prior to the May 2016 interrogation, and that he voluntarily waived his rights.

Based on the trial court's factual findings, Sinclair's subsequent reinitiation of contact with the detective in May 2016 was not the product of the prior unlawful interrogation. There was both a break in custody and a lapse of time between the two statements. Either factor would be sufficient to obviate the effect of the previous improper interrogation.

We cite *Shatzer* only to illustrate that this case isn't even close. Two months was enough time for Sinclair to "shake off" any residual coercive effects of the prior interrogation. The taint of the detective's improper questioning two months earlier had long since dissipated. We need not decide the exact amount of time that must pass to obviate the effect of a prior improper interrogation in cases where there has been no break in custody, as our decision is limited to the present circumstances.[1]

For these reasons, the trial court properly denied the motion to suppress.

*Affirmed.*

LEVINE, C.J., and ARTAU, J., concur.

* * *

***Not final until disposition of timely filed motion for rehearing.***

---

[1] While the passage of time after the invocation of *Miranda* rights is not a critical element in determining the voluntariness of a statement if the defendant has reinitiated further communications with police, *see Hunt*, 14 So. 3d at 1039, the passage of time can be a relevant factor in determining whether the reinitiation itself was voluntary *following a prior unlawful interrogation. See Calder*, 133 So. 3d at 1033 (holding that the defendant's reinitiation of the interrogation was involuntary under the totality of the circumstances where fewer than ten minutes had passed between the officer's improper comments, which were designed to induce the defendant to reinitiate the interrogation without a lawyer, and the defendant's reinitiation).