Filed 2/1/22  P. v. Nwuzi CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>CHINEDU NWUZI,<br><br>　　　Defendant and Appellant. | A159805<br><br>(Contra Costa County Super. Ct. No. 5-191645-1) |

　　　*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*) require police to cease custodial interrogation after a suspect unambiguously invokes his or her right to counsel.  In this appeal, defendant argues the trial court erroneously admitted statements that the police obtained in violation of *Miranda* and *Edwards*.  We agree that the trial court erred in admitting these statements, and we find that the error was not harmless (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)).  Accordingly, we reverse.

## BACKGROUND

　　　On the morning of March 27, 2019, between 10:45 a.m. and 10:49 a.m., two people called 911 to report an incident involving a man and a woman fighting.  One caller was in her apartment when she heard a commotion and went out to her balcony.  She

1

saw a man in a dark sweatshirt and sweatpants get out of a gold sedan, walk around to the passenger side, return to the driver's seat, and drive away. She estimated the man was approximately six feet tall. She testified at trial that she heard a woman screaming, but she conceded that when she called 911, she said the passenger was screaming at the top of "his or her" lungs. She could not tell the race or ethnicity of the driver or the passenger. The man drove away recklessly toward the nearby Walgreens.

The second 911 caller, Samantha Watt, saw a man driving erratically in the parking lot of Walgreens. A woman was hanging out of the partially-opened car door, screaming as the driver pulled her long, brown hair. Watt did not get a good look at the driver or describe him, the passenger, or the car during her 911 call.

At approximately 10:45 a.m. that day, Officer Chris Bruce was on patrol in the Windemere area of San Ramon when he received a dispatch notice to look for a gold-colored, four-door sedan driving recklessly. The dispatch notice described a male wearing dark clothing and a female in the car, but did not advise who was driving. Bruce drove northbound on a four-lane divided highway in the Windemere area and saw a gold-colored, four-door sedan heading southbound with a Black male driver in dark clothing and a female passenger. The two appeared to be arguing. Bruce made a U-turn at the next intersection and followed the sedan. He informed dispatch that he believed he had spotted the vehicle they were looking for heading towards Dublin and gave the car's license plate number.

2

Bruce initiated a traffic stop. The car pulled over, and Bruce gave dispatch his location. Bruce testified that the female passenger's hair was disheveled and she and the male were still arguing. The male driver appeared to be Black, wore a black jacket, and had dreadlocks. While Bruce waited for another officer to arrive, the sedan sped away. Bruce followed. When the car did not pull over, Bruce turned on his sirens. In his pursuit, Bruce observed the car speed at as much as 100 miles per hour, make unsafe lane changes, and turn into oncoming traffic. Bruce ended the chase for safety reasons, and the car headed south towards Interstate 580.

At approximately 11:00 a.m., a man and a woman came into a Dublin dog grooming store, Paws About Town, through the back door. The woman was screaming that they had been in a car crash and needed to use the phone. Approximately five minutes prior, Diego Plata, an employee who was working that day, heard "a big bang" from behind the shop that he thought was a car accident. Plata testified that the man who entered the shop was Black, about six feet one or two inches tall, and in dark clothing. He had dreadlocks and an odd scar on his forehead. Plata testified that the woman had lighter skin and that she was maybe Latina or mixed race. She was larger than the man and about the same height, and she had her hair up. She was wearing a dirty white shirt and tight pants, and she was carrying a jacket. Both acted distressed. Another employee, Lindsay Decker, allowed the woman to use the store phone. After the woman used the phone, the pair left and headed towards the

3

West Dublin BART station. Decker went out the back door of the store, which backs up to Interstate 680, and saw a light-colored sedan motionless on the freeway. California Highway Patrol (CHP) located the gold-colored sedan abandoned on the freeway, and Bruce went and identified the car as the one he had pursued.

Officer Kevan Lopez was on patrol when he received a dispatch to go to Dublin for a vehicle pursuit that had ended in a crash on the freeway with suspects seen running in the area. Lopez went to the West Dublin BART station to look for the suspects. There, he saw a Black man about six feet tall, around 225 to 275 pounds, wearing dark clothing and a backpack, who appeared to match the description of the man police were looking for. Lopez contacted the man with another officer. The man, later identified as defendant, was cooperative. In searching him, the officers removed a wallet and, Lopez believed, a cell phone. Police later located the female suspect not far from the BART station. She was upset, irate, crying, and appeared intoxicated. She gave a false name, but police eventually determined she was Devon McNary.

Officer Lopez and another officer, Matt Scully, transported defendant to Paws About Town for an in-field identification. Plata and Decker identified defendant as the man who had come into the store. Officer Lopez then drove defendant directly to the police station where he was later questioned by Bruce. Officer Scully drove Plata to where McNary was being detained, approximately five to 10 minutes from the pet store. When Scully and Plata arrived, McNary stood on the street with other

4

police officers, and Plata remained in Scully's car. At trial, Plata testified that he identified the person who was standing and speaking with the officers in the street as the man who had come into the store. Scully testified that the person Plata had identified was actually McNary.

Defendant was charged by information with one count of evading a peace officer with wanton disregard for the safety of others (Veh. Code, § 2800.2) (count 1) and one count of evading a peace officer while driving against traffic (Veh. Code, § 2800.4) (count 2). The information also alleged that defendant had suffered a prior strike for a serious or violent felony conviction (Pen. Code, §§ 667, subds. (d), (e), 1170.12, subds. (b), (c)), and had served several prior prison terms within the meaning of Penal Code sections 667.5, subdivision (b), and 1203, subdivision (e)(4).

A jury found defendant guilty of both counts. Defendant waived his right to a jury trial on his prior convictions, and the trial court found true the allegations as to defendant's prior convictions. At sentencing, the trial court struck the Penal Code section 667.5, subdivision (b) priors, but declined defense counsel's request to dismiss the prior strike conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. The court sentenced defendant to the midterm of two years on each count, doubled under the Three Strikes Law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), with the sentence on count 2 stayed pursuant to Penal Code section 654. Defendant timely appealed.

5

## DISCUSSION

### I.  Additional Background Regarding the Interview

After arrest, police put defendant in the "intoxilyzer" room at the police station.  The room was being recorded by a video camera.  Defendant asked the desk officer questions about why he was being held and whether he was charged with a felony that would "fuck up his parole," but the officer told him he did not know.

Officer Bruce then entered the room and confirmed that defendant had been told he was under arrest.  Bruce read defendant his *Miranda* rights while defendant sat on a bench in handcuffs.  Defendant responded "mhm" when Bruce asked him if he understood his rights.  Bruce told defendant that he was being charged with felony evading arrest; he further informed defendant that police had found defendant's vehicle, a gold Maxima defendant had bought the day before, abandoned on the freeway, and he (Bruce) was the officer who originally tried to pull defendant over.  Bruce asked defendant, "Do you wanna tell me anything about that?"  Defendant asked who was driving the car, and Bruce responded, "Well, you tell me.  It's your car."  Defendant said he had reported the car stolen.  Bruce asked a couple of follow-up questions about this alleged theft, including where defendant's car had been stolen from.  At that point, defendant said, "I wanna talk to my attorney."  Bruce said, "Ok.  Alright.  I'm done [inaudible]."

Approximately five seconds later, a CHP officer said to defendant, "Hey, there's an accident involving your vehicle.  You

6

mind if I ask you some questions or you just want to invoke your right to remain silent?" Bruce interjected, "For a separate incident involving your car." The CHP officer stated, "Right, for a separate incident involving a traffic collision, about 30 minutes ago." Defendant responded, "What happened? [inaudible] Tell me about the situation." The CHP officer said, "No. You tell us. You were in a vehicle. We've got witnesses you were involved in a traffic collision and they gave a general description fitting your, you know, physical characteristics. So, do you deny that you were in there or you just don't want to talk about it? [Pause] Just a traffic collision." Defendant replied, "I want to talk to my - cause I want to get more input about it." The CHP officer asked, "So you don't want to answer any questions?" Defendant replied, "I don't want to answer any questions." The CHP officer responded, "Alright, fair enough. Okay."

Approximately nine seconds after the CHP officer stopped talking, defendant said, "Hey, Officer." Defendant then said, "Like," while gesturing with his head a couple of times, followed by, "Come over here, man," or, "Come on man." Bruce testified that, when defendant did this, he looked at Bruce and made the "international sign of hey, come here, kind of thing." Before defendant began speaking, Bruce was at the entrance of the room talking to CHP officers, who were leaving. Bruce approached defendant, chuckling while responding, "Okay, alright. Well. You got something to say? What?" Defendant, shaking his head, looked up at Bruce and said, "Man. I fucked up bad. I fucked up." Bruce said, "How so?" Defendant explained he was two

7

months away from completing parole, and he was worried that new felony charges would jeopardize his status. Defendant begged Bruce not to charge him with a felony because he was trying to get off parole. He said to Bruce that he "[did not] want to be an asshole," and, "It's nothing personal. You're just doing your job." Bruce responded, "I'm not mad at you[,] man. [Defendant talking] It's been a long time since I've been in pursuit. [Defendant talking] I gotta keep up my skills." Bruce explained that defendant's parole officer was aware of the charges, and Bruce then explained why he had stopped defendant, referring to defendant as the driver.

A bit later, defendant inquired what made the charge a felony, and Bruce explained that driving against traffic elevated the charge. Defendant said he was sorry, and Bruce explained the charge was out of his hands, and "[e]verything is on film now. You know that, they film everything we do." Defendant responded, "I know." When Bruce mentioned his dash and body cameras, defendant said, "But it don't show me going the wrong way of traffic." After several minutes of further discussion, the following exchange occurred:

> Defendant: I wish, I just feel like, I was doing stupid shit, I didn't have nothing, I didn't have nothing on me to run for. I was clean and shit. No guns no nothing. It was just like the hassle, get out of the car.

> Officer Bruce: Yeah, at that point, we were just investigating. At that point nobody was in trouble nobody was going to jail. We were just stopping you because, domestic violence it's pretty gruesome, we

8

have to investigate that. We were just making sure nothing was going on. People call, we have to come.

[¶] . . . [¶]

Officer Bruce: . . . so like the only reason that you've going right now is the evading. That's it. That's all we're charging. Ok?

Defendant: [unintelligible] I wanted to stop[.]

Officer Bruce: You wanted to stop? But you just couldn't?

Defendant: She was like "Go, go, go[.]"

Officer Bruce: Oh, she was telling you to go? You see that's bad on her. You know what I mean? Let me ask you this, did you at least hear my sirens? Were they loud enough?

Defendant: I just saw the colors.

Officer Bruce: The red and blue?

Defendant: [unintelligible]

[¶] . . . [¶]

Defendant: What's your name Bruce? My bad, Bruce. I really fucked up. I really wish—I wish I would've stopped. I just wish everybody else [unintelligible]

Officer Bruce: Well, it happens bro. Like I said, I'm not mad at you.

Defense counsel moved in limine to exclude these statements as violative of defendant's Fifth Amendment rights and *Miranda*.[1] After hearing brief testimony from Bruce, the

---

[1] The only written support for the motion was two sentences seeking to exclude statements "made by defendant in violation of his Fifth Amendment rights," and requesting an Evidence Code section 402 hearing. At that hearing, the court framed the issue as follows: "Looks like what we have is a case in which a person was arrested, was -- looks like *Miranda*

9

trial court invited argument. The prosecution argued that police had ceased the questioning when defendant voluntarily summoned Bruce back and began discussing the case, thus waiving his *Miranda* rights. Defendant's counsel argued that defendant invoked his rights, then he did call Bruce over, but Bruce continued to question defendant without re-*Mirandizing* him. That, defense counsel claimed, constituted the *Miranda* violation. The court asked questions about whether more was required for a valid waiver when the right to counsel had been invoked as compared to the right to remain silent. Then, after additional argument, the court made a lengthy oral ruling.

The court began, "Once a *Miranda* right to counsel has been invoked, no valid waiver of the right to silence and counsel may be found absent [the] necessary fact that the accused and not the police re-open the dialogue with the authorities." The court commented that, while "it would be a nice rule to have a minimum in order to find a re-initiation that the police re-admonish a defendant[,] [i]t doesn't appear that that has become a bright-line rule." The court continued, "[W]hat is required is that the People carry the burden of proving to the Court and the Court finding that it was the defendant or the accused who initiates the dialogue and not the police. And the Court is aware

_____

advisements were given, and it appears on the record that the -- there was an invocation. [¶] And then it appears -- at least what the issue is to decide -- whether there was a reinitiation of the conversation by the defendant and whether or not that was actually reinitiation or not and [if it] was reinitiation whether or not the rest of what's being summoned by the People should be introduced into evidence."

10

that the law says that the police cannot design the way of their interview to make it look like it's the defendant who reinitiates. It cannot lay a reinitiate trap. It cannot soften him up to hope that he reinitiates. *They must -- the police must scrupulously obey the invocation of their rights. And if they do that and the accused then is the one who reinitiates the conversation, then there's no violation of the Miranda rights*." (Italics added.)

"Case law also suggests that voluntarily and spontaneously talking about the crime after a prior invocation is not in and of itself a reinitiation of questioning, but the Court is to look to all of the factors to determine whether or not it is the defendant or the accused who is the one who reinitiates and intends to reinitiate the conversation. [¶] [. . .] [¶] I have to look at this and assess whether or not there was a re-initiation by the defendant and that was his intent to -- while he understood his rights and he had been properly advised of his rights whether he on his own without any effort or work on the part of the officers reinitiated the conversation and, as part of that re-initiation, began to talk about the case. And reviewing the entire portions that have been submitted to me at least – that's all I can do is evaluate this record -- is that I am finding that the defendant did reinitiate the interview. [¶] It was his desire . . . ." The court further observed that "the officer throughout the interview is not one of those officers that was overbearing or creating these circumstances." And, if "that was the tone and tenor of the interview from that point on, then that helps the Court decide that it was a valid reinitiation of the conversation and therefore the defendant had

11

reconsidered his invocation and decided to waive his rights and speak to the officers."

The jury saw the videotaped interview, and the prosecutor argued that defendant's statements therein established his guilt.

## II.   Governing Legal Principles

*Miranda* "and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed." (*People v. Gamache* (2010) 48 Cal.4th 347, 384 (*Gamache*).)  If a suspect expresses a desire to deal with law enforcement only through counsel, police questioning must cease until counsel has been made available, "unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards*, *supra*, 451 U.S. at pp. 484–485.)  This is a " ' " 'bright-line rule.' " ' " (*Smith v. Illinois* (1984) 469 U.S. 91, 98.)  If the defendant's statements are made in response to discussion reinitiated by police after the defendant's invocation of the right to counsel without an appropriate break in custody, the defendant's statements are presumed involuntary and are inadmissible. (*Gamache*, at p. 385.)  The *Miranda-Edwards* rule applies during a continuous period of custody even where different officers seek to interrogate a suspect regarding different offenses after the suspect invokes the right to counsel.  (*Arizona v. Roberson* (1988) 486 U.S. 675, 682.)  An officer interviewing a suspect in custody has a duty to ascertain whether there has

been a previous request for counsel. (*Id.* at p. 687.) After a suspect has invoked the right to counsel, police officers may nonetheless resume their interrogation if the suspect (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. (*Gamache*, at p. 385.)

As our Supreme Court has recently made clear, where a *Miranda-Edwards* violation has occurred and the state contends that the defendant subsequently initiated further discussions with the police, the court must assess whether the defendant initiated further communication as a matter of fact. (*People v. Johnson* (2022) 12 Cal.5th 544 [2022 Cal. LEXIS 2, *62–*64] (*Johnson*).) A defendant " ' "initiates" ' further communication, exchanges, or conversations of the requisite nature [by] . . . 'speak[ing] words or engag[ing] in conduct that can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." ' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 642; *Johnson*, at *63.)

Where the defendant does initiate further communication after a *Miranda-Edwards* violation, the court "must next resolve whether [the] defendant's renewed contact with [police] should be deemed effective or instead the tainted product of the earlier *Miranda* violations, considering all the relevant surrounding circumstances." (*Johnson, supra*, 2022 Cal. LEXIS at *64.) " '[W]here law enforcement officers have disregarded a suspect's previously-invoked rights by continuing to interrogate him, a

13

renewal of contact by the defendant will be considered an "initiation" only if the decision to renew contact was not a "response to" or " 'product of' the prior unlawful interrogation." (*Id.* at *65.) " '[A] defendant's decision to talk with police cannot be a product of police interrogation, "badgering," or "overreaching," whether "explicit or subtle, deliberate or unintentional." ' " (*Ibid.*, citing *People v. Davis* (2009) 46 Cal.4th 539, 596 (*Davis*).) "Without this limitation, police 'might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.' " (*Davis,* at p. 596[2]; *People v. Boyer* (1989) 48 Cal.3d 247, 272–275 (*Boyer*) [rejecting argument that defendant initiated further conversation after invoking right to counsel where he called out to detective and spoke immediately following detective's interrogative statement]), overruled on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 84, 830, fn. 1.)[3]

---

[2] In *Davis*, the defendant invoked his right to counsel and police later encouraged him to talk, saying they had enough evidence to make a case without a confession. (*Davis, supra,* 46 Cal.4th at pp. 589, 591.) Our Supreme Court observed that the defendant's statements to police after he requested to speak with them, approximately 15 minutes after they had encouraged him to speak, would have been inadmissible but for the rescue doctrine exception to the *Miranda-Edwards* rule, which applied because the kidnapping victim might still have been alive. (*Id.* at pp. 596–599.)

[3] In other jurisdictions, in circumstances where there was an *Edwards* violation followed by a brief break in questioning and a defendant's request to speak to police, courts have found the defendant's subsequent statements to be the inadmissible product of the *Edwards* violation. (*United States v. Walker* (D.Md. 1985) 624 F.Supp. 103, 104–106 [suppressing brief

14

Additionally, even when a defendant effectively initiates further discussion, where reinterrogation follows, " ' "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." ' " (*Gamache, supra,* 48 Cal.4th at p. 385.) Whether the defendant made a valid waiver is " ' "a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " ' [Citation.] The state must demonstrate that the suspect knowingly and intelligently waived his right to counsel 'under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' [Citation.] . . . . '[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*People v. Hensley* (2014) 59 Cal.4th 788, 810.) Although a defendant's initiation of a conversation with officers " 'is strong and essential evidence of a knowing and intelligent waiver,' " it is not dispositive. (*Ibid.*) Rather, the initiation of further dialogue by a defendant "does not in itself justify reinterrogation."

---

statement made in "response" to an *Edwards* violation approximately an hour after violation]; *Wainwright v. State* (Del. 1986) 504 A.2d 1096, 1102–1103 [responsive statement made 45 minutes after improper interrogation inadmissible]; *United States v. Thomas* (11th Cir. 2013) 521 Fed.Appx. 878, 883 ["statement made 'no more than a few minutes' after an *Edwards* violation does not meet the legal standard for voluntariness"].)

(*People v. Sims* (1993) 5 Cal.4th 405, 440, citing *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1044.)

In evaluating a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda*, " 'we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*.' " (*People v. Molano* (2019) 7 Cal.5th 620, 633.)

### III. Analysis

Defendant contends the trial court erred in admitting his post-arrest statements because police obtained them in violation of the *Miranda-Edwards* rule. More specifically, he claims that: 1) officers impermissibly continued to question him after he invoked his right to counsel, rendering anything he said thereafter inadmissible; 2) his words when calling Bruce over could not be fairly said to represent a desire " ' " 'to open up a more generalized discussion relating directly or indirectly to the investigation' " ' " (*Gamache*, *supra*, 48 Cal.4th at pp. 384–385); and 3) even if defendant reinitiated conversation, the prosecution did not establish that he made a valid voluntary, knowing and intelligent waiver of his right to counsel. The Attorney General counters that police asked a couple of clarifying questions, then "scrupulously" honored defendant's invocation of his rights, defendant reinitiated conversation about the case, and he impliedly waived his right to counsel. As set forth below, we find that defendant's statements were the inadmissible product of

16

police interrogation following defendant's clear invocation of his right to counsel.

First, we address whether the officers "scrupulously" honored defendant's invocation of his right to counsel. After an unambiguous invocation of this right, police must cease interrogation. (*People v. Cunningham* (2015) 61 Cal.4th 609, 645–646 (*Cunningham*).) Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. omitted.) "The standard is whether 'under all the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the suspect." ' [Citation.] This is an objective standard. 'The subjective intent of the [officer] is relevant but not conclusive. [Citation.] The relationship of the question asked to the crime suspected is highly relevant.' " (*People v. Wader* (1993) 5 Cal.4th 610, 637.) This inquiry focuses on the perceptions of the suspect. (*Boyer*, *supra*, 48 Cal.3d at p. 275.)

The trial court's ruling was premised on the implied finding that police scrupulously obeyed defendant's invocation of his right to counsel, but the record does not support this finding. (See *People v. Clark* (1993) 5 Cal.4th 950, 985 [a finding of whether interrogation occurred is reviewed for substantial evidence], overruled in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

17

It is undisputed that, about five seconds after defendant invoked his right to counsel, the CHP officer spoke to defendant about what he called a "separate" traffic collision involving defendant's vehicle.[4]  When defendant said, "[T]ell me about the situation," the CHP officer responded, "No.  You tell us," clearly inviting defendant to talk.  The officer continued, "You were in a vehicle.  We've got witnesses you were involved in a traffic collision and they gave a general description fitting your, you know, physical characteristics.  So, do you deny that you were in there or you just don't want to talk about it?"  The officer paused briefly, then emphasized, "Just a traffic collision."  The accident at issue occurred shortly after Bruce terminated pursuit.  It was CHP that located defendant's car, and the CHP officer was present during at least part of Bruce's interrogation of defendant. Viewed objectively, the CHP officer's mix of statements and express questioning was reasonably likely to elicit an incriminating response.  It therefore constituted continued interrogation, not scrupulous honoring of defendant's invocation of his right to counsel.

We reject the Attorney General's contention that the CHP officer merely asked clarifying questions in the face of an ambiguous assertion of the right to counsel.  Where there is an ambiguous invocation of a suspect's Fifth Amendment rights before a *Miranda* waiver occurs, officers may clarify the

---

[4] The prosecution described this traffic collision to the court as "a separate hit and run, somewhat related to this case as it relates to the crash in this case."

18

invocation. (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217–218.) But " 'an unambiguous request for counsel or refusal to talk bars further questioning.' " (*Id.* at p. 219) After a *Miranda* waiver, questioning must cease when the suspect changes his or her mind and unambiguously invokes the right to counsel. (*Cunningham*, *supra*, 61 Cal.4th at pp. 645–646.) Here, there was no room for clarifying questions where defendant unequivocally invoked his right to counsel by stating, "I wanna talk to my attorney."

Having found that police did not properly cease interrogation when defendant requested counsel, we will accept for purposes of this opinion that defendant initiated further discussions of the requisite nature as a matter of fact because, as explained in more depth below, we find dispositive the question of whether defendant's " 'decision to talk' " was " 'a product of police interrogation, "badgering," or "overreaching," whether "explicit or subtle, deliberate or unintentional." ' " (*Johnson*, *supra*, 2022 Cal. LEXIS at \*65.)

In *Johnson*, police failed to honor the defendant's invocations of his rights to remain silent and to counsel four times during a three-hour period while the defendant was being treated for gunshot wounds after shooting and killing one of four police officers who responded to a domestic violence call. (*Johnson, supra*, 2022 Cal. LEXIS at \*52–\*53.) The last *Miranda* violation occurred when Patterson, a psychiatrist sent by the district attorney, attempted to interview the defendant. (*Id.* at \*53.) The defendant invoked his right to counsel, Patterson

19

stepped out of the defendant's hospital observation room to speak with police, and then Patterson followed the defendant to the X-ray room and back to the observation room. (*Id.* at *39–*40.) Approximately 20 minutes after invoking his right to counsel to Patterson, the defendant turned to Patterson and asked, "Still here, huh?" (*Id.* at *40–*41.) The defendant then spoke to Patterson about his mental health history and eventually began speaking about the shooting. (*Id.* at *41–*42.) The majority found that the defendant's decision to speak was not the product of police coercion or interrogation because the police did not badger the defendant; Patterson stepped out of the room after the defendant's invocation of his right to counsel and did not ask questions for approximately twenty minutes; the defendant led the conversation about his mental health and the events under investigation; and the defendant said he spoke because he had determined "it was 'best to be honest.' " (*Id.* at *68–*74.) The majority recognized that the defendant's contention that he did not "initiate the communication with Patterson is not without force," but found, after listening to the defendant's interview and considering the totality of the circumstances, that the defendant had freely initiated the conversation. (*Id.* at *62, *66, *80.)

In *Boyer*, by contrast, the defendant clearly invoked his right to counsel; improper and coercive interrogation ensued and then ceased; and, sometime later (after the defendant participated in allegedly voluntary fingerprinting), an investigator called the defendant back into the interrogation room and "launched into a monologue on the status of the

20

investigation," including an assertion that a new witness had directly contradicted some of the defendant's previous statements. (*Boyer*, *supra*, 48 Cal.3d at pp. 264–267, 274.) As the investigator turned to leave the room, the defendant called him back and said, "Hey, wait a minute. Come back here and sit down. You're right, I can't live with it. I did it. I didn't mean to do it. But I did it." (*Id.* at p. 267.) Our Supreme Court found that the investigator's remarks were clearly renewed interrogation initiated by the police, and the defendant's statements were the result of improper interrogation, not the defendant's voluntary initiation of discussion with police. (*Id.* at pp. 274–275.)

Upon independent review, we find that defendant's statements to Bruce were illegally obtained because they were the result of the authorities' improper continuation of questioning.[5] (See *People v. Sapp* (2003) 31 Cal.4th 240, 267–268 [independently determining defendant's decision to summon investigators and resulting statements were voluntary and not result of coercion or *Miranda* violation]; *People v. Neal* (2003) 31 Cal.4th 63, 80, 85 [finding defendant's initiation of contact with police after *Edwards* violation involuntary on independent review, stating subsequent confessions obtained in violation of

---

[5] The trial court concluded that defendant spoke of his own volition, but, as set forth above, this conclusion appeared to be premised on the erroneous implied finding that police scrupulously honored defendant's invocation of his right to counsel.

*Edwards* were inadmissible in case-in-chief, and holding them inadmissible for impeachment].)

Here, the circumstances show that the CHP officer engaged in questioning that was reasonably likely to elicit incriminating information after defendant clearly invoked his right to counsel, and the questioning had the direct effect of eliciting incriminating information. Importantly, prior to the impermissible questioning, Bruce told defendant that his car was found abandoned on the freeway, and defendant maintained it had been stolen. The CHP officer then invited defendant to explain what happened with the accident, relayed that a witness had linked defendant to the crash scene, and inquired whether defendant denied being there. Although defendant invoked his Fifth Amendment rights in immediate response and the CHP officer ceased his questioning, a mere nine seconds passed between the time the CHP officer stopped speaking and the time defendant called Bruce over to say, "Man. I fucked up bad." The impermissible interrogation was not overtly badgering, but the nine seconds that elapsed in this case are a far cry from the 20 minutes of silence between the *Miranda* violation and the defendant's ensuing initiation in *Johnson*. (*Johnson, supra*, 2022 Cal. LEXIS at \*70.) In further contrast to *Johnson*, defendant's interview does not suggest that he spoke out of an independent desire to be honest. (*Id.* at \*74.) Rather, the record shows that defendant changed his mind and spoke as a direct result of the CHP officer's improper questioning, in that he summoned Bruce over only seconds after the CHP officer's

questions made clear that defendant was unlikely to persuade law enforcement that his car had been stolen and driven by someone else. (Cf. *Boyer, supra,* 48 Cal.3d at p. 274 [statement "was the result" of an *Edwards* violation where defendant called officer back and confessed immediately after officer confronted defendant with a witness who "*disputed defendant's claim* as to the last time defendant had visited the victims' residence"].)

The bright-line rule of *Edwards* ensures that police do not, through impermissible interrogation, badgering, or overreaching, "explicit or subtle, deliberate or unintentional," persuade a defendant to incriminate himself notwithstanding an earlier request for counsel. (*Smith v. Illinois*, *supra,* 469 U.S. at p. 98; *Davis*, *supra*, 46 Cal.4th at p. 596.) On this record, we find that defendant's decision to speak to Bruce and his ensuing statements were the "tainted product" of the *Edwards* violation.[6] (*Johnson, supra*, 2022 Cal. LEXIS at *64.) As such, the statements were subject to the *Edwards* presumption of involuntariness (*Maryland v. Shatzer* (2010) 559 U.S. 98, 106 [describing the presumption]), and they should have been suppressed.

---

[6] With respect to the CHP officer's questions, the Attorney General argues only that these were permissible clarifying questions after an ambiguous invocation of the right to counsel, a position we have rejected. The Attorney General does not argue in briefing that, even if police violated *Edwards* by failing to scrupulously honor the defendant's invocation of his right to counsel, defendant's ensuing statements to police were nonetheless admissible.

We turn next to the question of whether the erroneous admission of defendant's statements was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24; *People v. Cunningham* (2001) 25 Cal.4th 926, 994.) Under *Chapman*, the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Keeping in mind that " 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him' " (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296), the admission of defendant's statements in this case was not harmless beyond a reasonable doubt. The prosecution's evidence was largely circumstantial. Before the chase, the 911 callers described a man driving the car they observed, but they did not provide much detail about the driver, the passenger, or the car. Neither of the employees from Paws About Town testified to seeing the crash behind the store. Defendant and McNary were both about six feet tall and apparently resembled each other enough that, at trial, one employee testified that he identified defendant at an in-field line up away from the store when police testified this identification was in fact of McNary.

Bruce provided the strongest evidence of guilt with his testimony that the driver of the car he pulled over appeared to be a Black man who had dreadlocks similar to those that defendant had in court. But, as defense counsel pointed out, Bruce first saw

24

the car from across the divided four-lane highway, and Bruce was pulled over behind the car for less than ten seconds before it drove off.  Bruce conceded that the car's back windshield had some tint, and he could not identify the passenger's race.  Bruce did not approach the car before it took off.  In court, he identified defendant as the man he interviewed at the station, but Bruce testified that he "did not see the driver until he was back at the station."

Finally, the prosecutor's closing argument emphasized defendant's statements to the police as evidence of his guilt, and the jury twice asked to review the videotaped statements during deliberations.  Approximately 11 minutes after seeing the videotape for the second time with enhanced audio, the jury reached a guilty verdict.  On these facts, we cannot conclude that "the verdict actually rendered in *this* trial was surely unattributable to the error" in admitting defendant's statements. (*Sullivan v. Louisiana, supra,* 508 U.S. at p. 279.)  His convictions must therefore be reversed.

## DISPOSITION

The judgment is reversed.

BROWN, J.

WE CONCUR:

POLLAK, P. J.
STREETER, J.

*People v. Nwuzi* (A159805)

25